284

THE STATE OF OHIO, APPELLEE, *v.* SMITH, APPELLANT.

[Cite as *State v. Smith* (1991), 61 Ohio St.3d 284.]

(No. 90–1433—Submitted June 4, 1991—Decided July 31, 1991.)

*Arthur M. Ney, Jr.*, prosecuting attorney, and *Christian J. Schaefer*, for appellee.

*Elizabeth E. Agar*, for appellant.

ALICE ROBIE RESNICK, J.   We have reviewed appellant's sixteen propositions of law, independently assessed the evidence relating to the death sentences, balanced the aggravating circumstances against the mitigating factors, and reviewed the proportionality of the sentences to those imposed in similar cases.   As a result, we affirm the convictions and sentences of death.

I

## Admission of Accused's Statement

In his initial proposition, Smith contends that his confession resulted from fear for his physical safety and occurred while he was under the influence of drugs and alcohol.   At the suppression hearing contradictory testimony was presented as to the facts surrounding this confession.

The following evidence was presented.   On September 28, 1987, an officer looking for Smith observed him driving a car, then followed and arrested him in a parking lot around 3:30 p.m.   Smith did not appear to be under the influence of drugs or alcohol while driving or when he was arrested; and police found no drugs or alcohol in the car except for a single beer can.   Police started interviewing Smith at 4:13 p.m. by advising him of his rights, and Smith executed a signed waiver of rights.   Police finished just after 6:00 p.m. and taped the last twenty minutes of the interview.   Police affirmed they never threatened, struck, choked, or otherwise touched Smith during the interview, nor did they promise him leniency.   Police testified that at the interview, Smith "had no odor of alcohol about him and his eyes were not dilated.   He didn't talk slurred.   He didn't appear to be under the influence of anything."

In contrast, Smith testified that he drank twenty-four beers that day and also smoked cocaine and marijuana.   Smith further claimed that during the interview a policeman smacked him in the face a few times, snatched him by

the collar, and pushed him against a wall and threatened to blow his head off. Smith asserted he would not have made a statement except for the force. The trial court overruled Smith's motion to suppress, finding no credible evidence of force or of Smith's incapacitation due to alcohol or drugs.

In determining a confession's voluntariness, "the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. * * * " *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324, paragraph two of the syllabus.

Smith argues that the state cannot prevail because it presented no witnesses. However, Smith called police officers as his witnesses, and their testimony supported the voluntariness of the confession. Compare *State v. Gray* (1984), 14 Ohio App.3d 43, 14 OBR 47, 469 N.E.2d 1340. At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. See *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583.

In this case, the evidence supports the trial court's finding that Smith's statement was voluntary. At the interview, police had convincing evidence linking Smith to the crime, including the victim's televisions which had been recovered and Smith's own bloody clothing. Police questioned Smith less than two hours, and thus questioning was neither prolonged nor intense. Smith, age twenty-nine and with a tenth or eleventh grade education, admitted prior incarcerations for breaking and entering. These facts, including his familiarity with the criminal justice system, all support voluntariness. Moreover, no credible evidence supports Smith's claim of use of physical force or that he was intoxicated when he confessed. Finally, the interview on tape supports the belief that his statement was voluntary. Compare *State v. Broom* (1988), 40 Ohio St.3d 277, 285, 533 N.E.2d 682, 692–693, with *State v. Brewer* (1990), 48 Ohio St.3d 50, 57–58, 549 N.E.2d 491, 499–500.

## II

### Appointment of Expert

In proposition of law II, Smith argues the trial court erred in declining to appoint a pharmacologist to advise and perhaps testify as to the effect of alcohol and drugs on Smith's system.

In deciding on requests for experts paid by the state, a trial court must make an informed decision if the services are "reasonably necessary for the proper representation" of an indigent defendant under R.C. 2929.024. In

addition, the court must also consider the availability of alternative devices to fulfill those same functions. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 193, 15 OBR 311, 336, 473 N.E.2d 264, 291; *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192; *State v. Broom, supra,* 40 Ohio St.3d at 283, 533 N.E.2d at 691.

Here, Smith's bare assertion of need, without particular facts to support that assertion, fails to establish reasonable necessity for the services. Moreover, Smith had alternate methods to fulfill that need. Smith's lawyers could have consulted several mental health professionals appointed by the court, who had examined Smith, to advise them on how drugs and alcohol affected Smith's mental state. In fact, Dr. Nancy Schmidtgoessling, Ph.D., testified about the effects of cocaine, marijuana and alcohol on Smith. Thus, the trial court did not abuse its discretion in denying the request. See *State v. Henderson* (1988), 39 Ohio St.3d 24, 30–31, 528 N.E.2d 1237, 1244; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116, 559 N.E.2d 710, 722.

### III

### Sufficiency of Evidence

In propositions of law III through VII, Smith challenges the sufficiency of the evidence presented to support the findings of guilt against him. Since these issues are intertwined, they can be analyzed together.

In a review for sufficiency, the evidence must be considered in a light most favorable to the prosecution. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930. As we have held:

"A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

In proposition of Law III, Smith argues that the prosecution failed to prove that Bradford was still alive when Smith had sex with her. Smith contends that Bradford died within three or four minutes of fatal wounds eight and nine and that these wounds must have been inflicted while Bradford was still in the living room. However, the evidence shows that Bradford was alive when Smith raped her. Smith admitted "she [Bradford] was still breathing" when he had sex with her after she had been stabbed.

Moreover, the facts support the view that wounds eight and nine must have been inflicted while Bradford was in the bedroom. Smith's pretrial confession suggests that the chest stabbings occurred after he had sex with her in the

bedroom, since he ascribed her earlier loss of blood while in the living room to the stomach wound. The absence of signs of struggle in the apartment, and the absence of defensive and twisting wounds in Bradford's body, tend to prove that Smith stabbed her several times while in the bedroom after he raped her. The physical evidence, including Bradford's bloodstained pants and panties scattered on the bedroom floor, is also consistent with her being raped alive in the bedroom. Moreover, Smith could have raped her while in the bedroom even if he had inflicted stab wounds eight and nine while in the living room just minutes before. Thus, all the elements of rape are established by the evidence.

In proposition of law IV, Smith argues that the evidence fails to establish that his intent to take Bradford's property or the actual taking of the property coincided with his threat or use of force and hence he is not guilty of aggravated robbery. In effect, Smith argues Bradford was already dead before he decided to take her property.

However, the victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching her die, and then stealing her property after the death. See *State v. Jester* (1987), 32 Ohio St.3d 147, 151–152, 512 N.E.2d 962, 968; *Conrad v. State* (1906), 75 Ohio St. 52, 78 N.E. 957.

Moreover, the evidence establishes Smith's intent to rob Bradford even before he stabbed her. According to Smith, he was angry when he returned and discovered his cocaine gone. He wanted "restitution" from Bradford, and took it initially in the form of sex. "[B]ut then after I got that it wasn't good enough, you know, so I asked her like you got any money and stuff, you know. She said she ain't have no money. So we start arguing and stuff and next thing * * * [she got a knife]." Thus, Smith, even before the stabbing, was demanding money and property "as restitution," and the stabbing occurred as a result of those demands for money and property.

Additionally, the panel could have found, under the evidence, that Bradford was not dead when Smith began taking her property. Bradford was clearly alive, according to Smith, when he had sex with her after she had been stabbed in the stomach. He could well have inflicted wounds eight and nine (the most lethal) any time after that, and the coroner testified that Bradford could have lived up to five minutes after those stab wounds. Smith may have even inflicted those stab wounds after he started carrying away her property because he admitted he made four trips to his car.

In propositions of law V and VI, Smith argues that the state failed to prove the specified aggravating circumstances that the murder occurred while Smith

was committing or attempting to commit or fleeing immediately after committing or attempting to commit the offenses of rape and robbery. However, as discussed, the prosecution proved that the murder occurred in the course of rape and aggravated robbery. The term "while" in R.C. 2903.01(B) means only "that the murders were associated with the kidnappings, robbery, and rapes 'as part of one continuous occurrence * * *.' " *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, following *State v. Cooper* (1977), 52 Ohio St.2d 163, 6 O.O.3d 377, 370 N.E.2d 725.

In proposition of law VII, Smith argues that the trial court should have convicted him only of voluntary manslaughter because the victim attacked him first and he was under extreme emotional stress. "Extreme emotional stress, as described in R.C. 2903.03, is a circumstance, the establishment of which mitigates a defendant's criminal culpability." *State v. Muscatello* (1978), 55 Ohio St.2d 201, 9 O.O.3d 148, 378 N.E.2d 738, paragraph two of the syllabus.

"Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force.* * * " *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph five of the syllabus.

However, the evidence supports the commission of aggravated murder and not manslaughter. See *State v. Sowell* (1988), 39 Ohio St.3d 322, 333, 530 N.E.2d 1294, 1306–1307; *State v. Huertas* (1990), 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058, 1068–1069. The trial panel may have believed that Smith did not lose any cocaine in the house or, that if he did, Bradford was not responsible for that loss. In any event, her refusal to provide "restitution" did not constitute "serious provocation occasioned by the victim" within the meaning of R.C. 2903.03. Bradford, a small, asthmatic forty-seven-year-old woman, facing demands for sex, money and other property, could defend herself by a knife from her own kitchen. Even if she did so, and got stabbed in the ensuing struggle, she did not provoke the nine stab wounds that Smith thereafter viciously inflicted on her. The lack of defensive wounds or bruises on her body supports the lack of provocation and Smith admitted that he sliced Bradford's throat to silence her because she called him a name.

In sum, the evidence was more than adequate to sustain the convictions against challenges to the sufficiency of the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212; *State v. Eley, supra.*

## IV

### Prosecutorial Misconduct

In proposition of law VIII, Smith claims that the prosecutor's remarks during sentencing caused prejudicial error. Smith first complains that the

prosecutor compared him with various notorious murderers. However, Smith's counsel objected, and the court sustained the objection and told the prosecutor that he "should be arguing this case." Thus, at most, the prosecutor made improper comments at a bench trial, an objection was made and sustained, and the trial proceeded. In a criminal bench trial, the presumption is that the court considered only relevant, material and competent evidence in arriving at its judgment. *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759; *State v. Brewer, supra,* 48 Ohio St.3d at 55, 549 N.E.2d at 497. In this case, the court affirmatively rejected the prosecutor's comments. Thus Smith's claim of prejudicial error lacks any merit.

Smith also argues that the prosecutor, in his penalty phase argument, improperly referred to mitigating factors not raised by the defense. However, the prosecutor only briefly referred to some statutory factors simply to demonstrate those factors were not involved. His comments did not inject improper comments before a jury as condemned in *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557–558. Additionally, the panel of judges must be presumed to have based their judgment only on relevant factors. *State v. Post, supra.* Moreover, Smith's counsel did not object to the prosecutor's remarks and thereby waived all but plain error. See *State v. Greer* (1988), 39 Ohio St.3d 236, 244, 530 N.E.2d 382, 394; *State v. Landrum, supra,* 53 Ohio St.3d at 111, 559 N.E.2d at 717. Finally, our independent reassessment of the sentence will eliminate any sentencing error that may have occurred. See *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304; *State v. Landrum, supra,* 53 Ohio St.3d at 124, 559 N.E.2d at 729.

## V

### Sentencing Errors

Smith asserts in proposition of law IX that the trial court erred when it failed to list Smith's cooperation with the police investigation as a mitigating factor. However, Smith's proposition lacks merit for several reasons. His counsel did not argue at trial that Smith's cooperation was a mitigating factor. Counsel cannot now raise, as a new mitigating factor, that which he failed to address at trial. See *State v. Henderson, supra,* 39 Ohio St.3d at 30, 528 N.E.2d at 1244; *State v. DePew, supra,* 38 Ohio St.3d at 289, 528 N.E.2d at 557–558. Moreover, the weight or importance to be given mitigation evidence is up to an individual decision maker, who may choose not to give any weight to any particular mitigating factor. *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus; see *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347.

In this case, Smith's "cooperation" was not valuable as a mitigating factor. The police had already recovered the victim's televisions, along with Smith's bloody clothing, before they even arrested Smith. Smith did not turn himself in and, when he was arrested, he initially denied any involvement other than driving Bradford home. He continued to lie to police about selling the stereo in Dayton. We have previously recognized that a confession after initial denials of a crime does not show the mitigating factor of "cooperation" with the police. *State v. Steffen, supra,* 31 Ohio St.3d at 117, 31 OBR at 278–279, 509 N.E.2d at 390.

In addition, our independent reassessment of the sentence will cure any deficiency in the trial court's sentencing decision. *State v. Lott, supra; State v. Landrum, supra.*

In proposition of law X, Smith argues that the trial court used the nature and circumstances of the offense as a nonstatutory aggravating circumstance; however, Smith's argument lacks merit because the panel's opinion listed only the nature and circumstances of the offense as a possible, but not relevant, mitigating factor. Their opinion did not list any nonstatutory aggravating circumstances. Their reference to the nature and circumstances of the offense was proper, since "[u]nder R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. See *State v. Lott, supra,* 51 Ohio St.3d at 171, 555 N.E.2d at 305.

VI

Constitutionality

In proposition of law XI, Smith argues that Ohio's felony-murder provisions fail to constitutionally narrow the persons eligible for the death penalty. He argues further that the same conduct cannot be used both as an aggravating circumstance for sentencing and as an element of an aggravated felony-murder.

However, Smith foreclosed this issue by not raising it at trial. "Failure to raise at the trial court level the issue of the constitutionality of a statute * * * constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. Moreover, we have consistently rejected arguments similar to Smith's. *State v. Henderson, supra,* paragraphs one and two of the syllabus.

See, also, *State v. Barnes* (1986), 25 Ohio St.3d 203, 206–207, 25 OBR 266, 269, 495 N.E.2d 922, 924–925; see *State v. Jenkins, supra.*

Smith's proposition of law XII challenges the constitutionality of Ohio's death penalty provisions using a wide variety of arguments. However, Smith failed to challenge the statute at the trial below on these points and hence waiver applies. *State v. Awan, supra; State v. Greer, supra,* 39 Ohio St.3d at 244, 530 N.E.2d at 394. Moreover, we have rejected all constitutional arguments similar to the ones that Smith now raises. See *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284; *State v. Bedford* (1988), 39 Ohio St.3d 122, 132, 529 N.E.2d 913, 923; *State v. Sowell, supra,* 39 Ohio St.3d at 336, 530 N.E.2d at 1309.

## VII

### Sentencing

At the penalty hearing, Gary Carter, Smith's uncle, testified that Smith worked for him one summer as a steel worker and that Smith is nice, intelligent, with a nonviolent disposition but easily led and manipulated. Michael Carter, another uncle, also described Smith as not aggressive or violent, and easily led.

Bertha Reid testified that Smith grew up in foster homes from the age of eleven months until he was ten years old. He suffered child abuse in these foster homes, and from age ten until the time of the trial he never recovered from that abuse. From an early age, he stole small items from neighbors and other children. Reid pleaded that her son's life be spared.

Reverend Timothy McDonald III, an Atlanta Baptist pastor, testified on Smith's behalf. McDonald counselled Smith and his wife on at least three occasions. He believed Smith's wife loved her husband, and that Smith was basically a good person and a good provider. However, Smith suffered from alcohol and drug dependency, and this dependency interfered with his marriage and Smith's contributions to his family.

Dr. Nancy Schmidtgoessling, a psychologist, submitted a mitigation evaluation report on Smith and testified at the penalty hearing. She stated that Smith, born in October 1957, came from a chaotic home environment, with a schizophrenic, abusive, neglectful mother, and an unknown father. Early psychological reports on Smith showed problems. A psychologist in 1964 termed him "emotionally disturbed." In 1965, a psychologist said his "reality contact was 'precarious' " and his "thinking sometimes borders on autistic." In 1965, after acting destructively and setting a fire, he was committed to Longview, a state mental hospital. In childhood, he displayed "hyperactivity,

some learning problems secondary to distractibility, poor achievement in school, a lot of behavior problems, stealing, fighting in school."

Smith dropped out of school in the tenth or eleventh grade and started working. He took pride in his ability to have a job and take care of himself. Test results on his IQ fluctuated. In 1965, he tested at 101, normal, but at Longview, he tested at full scale 77. In prison, he tested at 91. In 1987, his performance IQ was 84, verbal was 78, and full scale was 78. His ability to make decisions, recall information, and adapt to daily life was near average; and his ability to function in an academic setting was substantially below average although he certainly was not mentally retarded. Although Smith reported extensive alcohol and substance abuse, the extent of his use and dependency on drugs and alcohol was not confirmed. Smith had been incarcerated twice before and seemed to respond well in a highly structured environment.

As an adult, Smith exhibited high dependency needs and ongoing anti-social behavior. Smith did not display any mental illness such as schizophrenia, manic depression, mental retardation, nor did he ever suffer any major psychological disorder. He was able to appreciate the criminality of his acts and could conform his conduct to legal requirements. However, he failed to develop sophisticated psychological ways to deal with his problems and lacked a healthy regard for the needs, feelings, or values of other people. He tended to be impulsive; however, he was energetic, congenial, and fairly outgoing. He appeared to be hypersensitive, concerned about being exploited or "ripped off," and internally very protective. According to Dr. Schmidtgoessling, Smith never expressed remorse or sorrow for Bradford's fate and apparently thought she was alive even after he left the apartment. Smith also seemed "to have a specific discomfort with and anger towards women."

In an unsworn statement, Smith told the panel:

" * * * I did not go to her apartment for any reason other than to get my stuff, and I was invited. We did go to bed together. She got the knife, and I don't know what happened to me. It is a big blur, and I guess I sort of went mad. I didn't want to hurt her, but what am I to do when faced with something like this? I am very sorry for what did happen to her, and I am very sorry she is dead; but it was beyond my control. I have asked for help before, and did not get it. So it is too late now. But again, I ask for help and the mercy of the court. Thank you, members of the panel."

After the panel members decided on the death penalty, the court at sentencing asked Smith if he had anything else to say before sentence was passed. Smith then asserted:

" * * * No, I didn't kill this lady. * * * When I left, she was still alive. No cuts. No blemishes. Nothing. * * * I did run into a friend of mine. * * * I

did not go back upstairs. He went upstairs. He should have all of this. * * * I think you ought to go find Ricky, is what you ought to do (weeping) * * *.''

In proposition of law XIII, Smith argues that the evidence did not establish that the aggravating circumstances outweighed the mitigating factors. After independently assessing the evidence, we have decided that the aggravating circumstances do outweigh mitigating factors beyond a reasonable doubt.

The evidence supports the aggravating circumstances that Smith purposefully killed Bradford as the principal offender while committing rape and aggravated robbery. After independent consideration, we conclude that nothing in the nature and circumstances of these crimes offered mitigation. The facts reveal that Smith raped an asthmatic, forty-seven-year-old grandmother in her own bedroom, after she had already been stabbed. During or after the rape, he then forcefully stabbed her nine times causing her death within five minutes. Smith then callously made four separate trips to take her property to his car and left her to die.

In contrast, Smith's history, character, and background do offer mitigating features. Smith clearly had an arduous childhood, and his early life shaped a personality with serious character defects. His limited mental capacity, childhood deprivation, and alcohol and drug dependency all reflect mitigating features. We find his history and background to be a mitigating factor, as did the trial court.

In proposition of law XVI, Smith argues that sentencing him to death, because of his borderline intelligence, constitutes cruel and unusual punishment. However, the evidence does not show Smith to be mentally retarded, and in fact Smith tested in prison as showing an IQ of 91 in 1980 and 1986 or 1987. Smith's limited intellectual capacity is a mitigating factor; however, his low intelligence does not raise constitutional issues. See *Penry v. Lynaugh* (1989), 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256. Hence, proposition XVI lacks merit.

Smith argues that Bradford "induced or facilitated" the offense, as defined in R.C. 2929.04(B)(1), and that when he killed her, he acted "under duress, coercion, or strong provocation," as defined in R.C. 2929.04(B)(2). However, our independent analysis of the evidence does not support those claims. Smith's doubtful claim that he lost his cocaine in Bradford's house did not justify his attack on her. If she got a knife from her kitchen, as Smith claims, she was entitled to defend herself. She did not thereby induce, facilitate or provoke his subsequent vicious assault, rape and robbery.

Dr. Schmidtgoessling's evidence failed to establish any mental disease or defect qualifying under R.C. 2929.04(B)(3); Smith's age of twenty-nine ne-

gates R.C. 2929.04(B)(4); and no claim is made invoking R.C. 2929.04(B)(5) that Smith lacked a significant criminal history. The evidence shows no more than a single actor; hence, R.C. 2929.04(B)(6) is not raised. However, in his final statement before the court imposed the death sentences, Smith in effect asserted that another was responsible for the murder. But, there is no evidence to support this allegation. Hence, no weight should be given to this factor, again negating R.C. 2929.04(B)(6).

As to significant "other factors," we recognize Smith's deprived childhood, flawed upbringing, character defects, and drug and alcohol dependency as mitigating. See R.C. 2929.04(B)(7). Despite Smith's claims of innocence before the death sentences were passed, we reject residual doubt as an "other factor."

When weighing the aggravating circumstances against mitigating factors, we find that the aggravating circumstances do outweigh the mitigating factors beyond a reasonable doubt. The aggravating circumstances are substantial—the rape and robbery of a helpless woman in her own home by someone she invited in. In contrast, the mitigation case appears inconsequential. While unfortunate, Smith's upbringing did not result in a mental disease or defect, as opposed to a character defect. Smith vacillates between accepting responsibility for what occurred and trying to shift the blame onto others. His claims lack authenticity, and he has not solidly demonstrated any remorse, sorrow, repentance, or desire for rehabilitation.

In propositions of law XIV and XV, Smith argues that the sentences of death are disproportionately severe when compared with the sentences in other similar cases. Comparative proportionality review is not constitutionally required. *Pulley v. Harris* (1984), 465 U.S. 37, 50, 104 S.Ct. 871, 879, 79 L.Ed.2d 29, 40. The proportionality review mandated in R.C. 2929.05 "is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." *State v. Steffen, supra,* paragraph one of the syllabus. Non-capital cases do not have to be included in the review. *State v. Coleman* (1988), 37 Ohio St.3d 286, 293–294, 525 N.E.2d 792, 800; *State v. Beuke, supra,* 38 Ohio St.3d at 37, 526 N.E.2d at 283.

In this case, the sentences of death are both appropriate and proportionate when compared with other similar murder cases. *State v. Lott, supra; State v. Henderson, supra; State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883; *State v. Greer, supra; State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394; *State v. Steffen, supra.*

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.