OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Justine Michael, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Rojas, Appellant.

[Cite as State v. Rojas (1992),     Ohio St. 3d     .]

Criminal law -- Aggravated murder -- Death penalty upheld, when.

(No. 91-374 -- Submitted April 28, 1992 -- Decided July 1, 1992.)

Appeal from the Court of Appeals for Hamilton County, No. C-880332.

On May 14, 1987, Martin J. Rojas, defendant-appellant, forcibly entered the apartment of Rebecca ("Becky") Scott, stabbed her in the back and raped her. Before he left, Rojas washed his clothes, spread paint stripping gel, an accelerant, throughout her apartment, opened a gas valve to the kitchen stove, lit several candles, and stole $25 from Scott's purse.

## Guilt Phase

In 1986, Rojas moved from Denver, Colorado to Cincinnati where he enrolled in a drug and alcohol rehabilitation program. Later that year, Rojas attended the Voice of Calvary Church and met Scott. They became friends. Scott devoted herself to weaning Rojas from drugs and alcohol; however, Rojas apparently wanted Scott as his girlfriend. Because Rojas had struck Scott several times, they went together on May 13 to the home of Edna White, a lay minister and speaker for the church. Becky exhibited bruises on her neck and arm. White, Becky and Rojas prayed together for Rojas to reform. On May 14, Becky told Rojas she did not want to see him again.

According to his later confessions, Rojas decided to kill Scott after she rejected him on May 14. That afternoon, he purchased a filleting knife, telling the clerk that it was a gift for a bachelor party. He then called Scott, who refused to meet him at her apartment building. But she did agree to meet him at a nearby restaurant at 6:30 p.m. Rojas then went to Scott's apartment and hid outside in the hallway. Around 6:15 p.m., when Scott left to go to their meeting, Rojas confronted her, pulled her by the hair, chased her into the apartment, and stabbed her in the back.

After stabbing Scott, Rojas removed her clothes and his clothes and raped her twice. In two confessions, Rojas admitted that Scott was still alive when he had intercourse,

and the coroner estimated she lived from one to three hours after the knife wounds were inflicted. According to Rojas, Becky told him, as she was bleeding to death, that she loved him and forgave him, that God also loved him and forgave him for what he had done.

According to his confessions, Rojas stayed in Scott's apartment for approximately five and one-half hours. He stole $25 from her purse and washed and dried his clothes to remove the blood. From a gallon container, he spread a highly flammable gel paint-and-varnish remover throughout the apartment so that a resulting fire would destroy the crime scene. He disconnected the kitchen stove to create a natural gas leak and he lit several candles around the apartment. He left at midnight. When he arrived home, he hid the clothes he had been wearing.

On May 15, Rojas called Edna White. He told her he had killed Scott. "She's with Jesus," he said. He also said he intended to kill himself by jumping off a bridge. Instead, Rojas cashed his paycheck and took a 12:50 p.m. bus to Denver, Colorado. After Rojas' telephone call, White called a copy center, where Scott worked (located on the ground floor in Scott's apartment building). White asked that someone check on Scott.

Daniel Krieger, a copy center employee, climbed an outside fire escape to Scott's third floor apartment. Once inside, Krieger discovered Scott's body cold and naked on her bedroom floor. Krieger summoned co-worker Daniel Engle, and another co-worker called the police. An opened kitchen window had apparently prevented the gas from reaching an explosive level. Krieger, Engle and the police turned the gas off, extinguished the candles, and opened other windows. No fire or explosion occurred.

Police found a highly flammable pink gel, containing methanol, acetone, methylene chloride, and toluene, spread throughout the apartment. Police detected acetone and toluene on a pair of Rojas' shoes recovered from where Rojas lived. Police found candles on Scott's kitchen stove, in the dining room, and on the bedroom floor near Scott's feet.

The physical evidence corroborated the confessions made by Rojas. In the kitchen, police found the murder knife and the sales receipt for the knife. The receipt contained Rojas' fingerprint. Police found Rojas' fingerprints or palm prints elsewhere in the apartment, and they found the red gift box for the knife just outside Scott's apartment where Rojas had discarded it. Police also found Rojas' fingerprints on the gift box and on the tissue paper inside. The store clerk who sold Rojas the knife identified Rojas, the knife, the sales receipt, and the gift box.

The coroner confirmed that Scott died from two stab wounds, a six-inch wound to the back and a five-inch chest wound. The stab wounds were not immediately fatal, and Scott could have lived from one to three hours. With timely medical intervention, she might have survived the wounds. Scott had blood type A-positive, consistent with blood found on the murder knife, on a rug in the kitchen wastebasket, on her nearby clothes, on a bed sheet, and on Rojas' clothing found at his residence. Chemical and microscopic examination revealed

evidence of semen in Scott's vagina, and a swab of her nipples revealed evidence of saliva.

On May 18, the day after Rojas was arrested in Denver, Detective Sergeant Joe Russell secured a fifty-three-minute videotaped confession.  Rojas had been advised of his Miranda rights.  Also on May 18, Cheviot, Ohio Police Chief Voss advised Rojas of his rights and secured a tape-recorded confession.  Over defense objection, the trial court admitted Rojas' videotaped and tape-recorded confessions.

In both statements, Rojas claimed to have been drinking heavily in a bar and taking amphetamines just before the murder.  Rojas mentioned a voice in his head that told him to kill Scott.  Rojas asserted that a romantic tie existed between them.  He had been seen frequently at her apartment.  Several shirts found in the apartment supposedly belonged to Rojas.

Rojas was charged with seven offenses, including murder with prior calculation and design (Count I), aggravated murder with three death specifications alleging murder in the course of aggravated burglary, rape, and aggravated robbery (Count II), aggravated burglary (Count III), rape (Count IV), aggravated robbery with a knife (Count V), aggravated robbery causing serious injury (Count VI), and aggravated arson (Count VII).  Although Rojas pled not guilty by reason of insanity, he presented no testimony disputing mental responsibility.  A three-judge panel found him guilty as charged.

### Sentence Hearing

At the outset of the sentencing hearing, Sheriff's Lieutenant George McCamey reported that Rojas had attempted to escape and had repeatedly threatened to escape.  As a precaution, the court ordered Rojas shackled.

Rojas asserted he wanted no mitigation evidence presented beyond his own unsworn statement.  He explained:

"I feel that it's not necessary to have the doctors testify because the only reason why I pleaded insanity was because I consider it as my last straw of hope of being able to reside in society again[.] * * * I tried to persuade them to believe that I was on the borderline personality or had difficulties with my mind, and I feel that their reports that they have are inaccurate, considering my behavior and my characteristics of my personal life."

Despite Rojas' request, his attorneys presented expert testimony from psychiatrists and psychologists.  A psychologist, two Ph.D. clinical psychologists and two psychiatrists testified for the defense; a clinical psychologist testified for the state.  The experts confirmed that Rojas suffered from disorders resulting from substance abuse and most agreed that he had a borderline personality disorder.  They disagreed on the extent of this condition, on Rojas' mental abilities, and the extent to which he was malingering.

Dr. Robert W. Noelker, a clinical psychologist, found Rojas to be multihandicapped, retarded with a performance IQ of fifty-seven, and suffering from major personality disorders and probable organic brain damage.  Noelker found Rojas to have been actively psychotic at times, suffering from delusions and hallucinations, especially religious preoccupations.  Noelker found Rojas competent to stand trial, but substantially

impaired at the time of the murder. Rojas' behavior disorders were a chronic and severe mental disease or defect of longstanding duration and multiple causation. Noelker found no evidence of malingering.

Dr. David Helm, a psychiatrist who examined Rojas before trial, found it difficult to conclude whether Rojas suffered from mental illness. Helm found that Rojas was not competent to stand trial, but Helm did not dispute subsequent findings of competency since he suspected that Rojas was not honest in the interview. Helm never formed an opinion as to Rojas' ability to distinguish right from wrong or his frame of mind at the time of the offense.

Dr. Michael F. Hartings, a clinical psychologist, found Rojas to be a marginally functioning handicapped individual, who was significantly impaired in his psychological, social and occupational functioning. Rojas refused to take an intelligence test from Hartings; however, Hartings concluded that Rojas was not retarded. Hartings estimated Rojas' IQ to be eighty to ninety, and Hartings regarded the estimate of sixty as definitely too low. When tested, Rojas intentionally gave incorrect answers. While Rojas may have had prior psychotic episodes, Rojas was not psychotic at the time of the offenses or when Hartings saw him. According to Hartings, Rojas suffered from behavior disorders but not from a substantial mental disease or defect. Rojas exhibited a high level of activity requiring concentrated and directed efforts, suffered no loss of cognition or control over his behavior, knew his actions were wrong and could have conformed his behavior to the law. Rojas had little empathy for others and little rehabilitation potential.

Hartings reported that Rojas said he had had intercourse with Scott for the first time on the day before the murder:

"[I]mmediately thereafter she [Scott] turned away from him, apparently in prayer, and to God, and with remorse, and I think he--his fragile self concept, his fragile ego, had a very hard time  integrating that  in acting rationally,  in dealing * * * with his frustration."

Mark Kroger, a counseling psychologist, concluded that Rojas was retarded and had a verbal IQ of fifty-five. Rojas' judgment, reasoning skills, and memory were all impaired. Kroger found past symptoms of schizophrenia, and he believed Rojas was then in the residual phase of schizophrenic disorder. Kroger did not believe Rojas was malingering; however, Kroger never talked to Rojas after an initial pretrial interview. Kroger believed Rojas had a significant mental disease or defect that kept him from conforming his conduct to the law. Yet, Kroger agreed that Rojas did not meet the criteria for the defense of not guilty by reason of insanity. Kroger agreed Rojas was a poor candidate for rehabilitation.

Dr. Glenn M. Weaver, a forensic psychiatrist, concluded that Rojas, while in prison in 1983, appeared on the brink of psychosis, paranoia and schizophrenia. Weaver noted that previous tests indicated that Rojas had an IQ in the sixty-seven to seventy-five range, but he believed Rojas functioned at a level of eighty-five to ninety. Weaver testified that "substance abuse" and "borderline" personality disorders were mental diseases or defects. At the time of the

offense, Rojas suffered from uncontrollable anger, rage, and instability of mood.  Weaver agreed that Rojas knew right from wrong and could refrain from wrong, but he thought Rojas was a candidate for the defense of diminished capacity.  Weaver agreed that Rojas may have tried to make himself look less intelligent than he is.

In an unsworn statement, Rojas reported that he tried to make the doctors believe he was stupid and that he had a terrible childhood.  He asserted that his lawyers held back evidence showing he was not mentally retarded.  Rojas would accept whatever punishment the court decided upon, and he hoped that Scott's family would forgive him.  Rojas killed Scott because she rejected him.  Previously, she had accepted him for what he was and knew she could not persuade him to change.

He said he felt "[o]verwhelmed completely with depression and stress, not because I'm in jail, but because of what I did.

"I don't * * * believe that the Court should have any mercy on me * * * because I didn't have no mercy on Becky when I killed her. * * *

"* * *

"I feel that if the death sentence is not imposed that justice will not be completed on my behalf and the family of Ms. Scott and those of her friends."

Marilyn Brooks, an assistant hotel manager, testified that Rojas functioned well as a hotel telephone operator from December 1986 to May 1987.  Rojas was cooperative, met all hotel standards, never had difficulty comprehending instructions, had an excellent time and attendance record, and performed well under stress.  Rojas did not appear to be mentally retarded, nor was he known to abuse drugs or alcohol. Rojas was talented as an artist, and Brooks encouraged him to take up commercial art.  Brooks testified that his artwork was nothing like the stick drawings he drew for the doctors who examined him.

Dr. Donald G. Beal, a clinical psychologist, found Rojas to function in the dull normal range, with an IQ in the tenth or fifteenth percentile, and not retarded.  Rojas refused intelligence tests, and Beal concluded that Rojas was malingering, by deliberately answering questions incorrectly and by falsely reporting that he heard voices.  Beal believed that Rojas was competent to stand trial.  Rojas did have psychological problems with impulse control and substance abuse, but he could refrain from committing acts he knew to be wrong, and he knew what he did to Scott was wrong.  Beal reported that a day or two before the murder, Scott and Rojas had sex for the first time.  Scott then asked Rojas to give his life to God.  That discussion triggered Rojas' anger and the later chain of events.

A presentence investigation ("PSI") revealed Rojas, born on November 2, 1959, had eight arrests as a juvenile.  Juvenile courts placed him on probation for burglary and theft and later sentenced him to two years for robbery.  As an adult, Rojas was convicted of aggravated motor vehicle theft, vehicle theft, menacing, criminal mischief, resisting arrest, assault, forgery, and DUI.  In 1986, Rojas was convicted in Ohio for DUI and theft.  Rojas refused to make any statement for the PSI report, but a previous Colorado presentence report revealed

that Rojas had eight half-brothers and half-sisters, and that his father left his mother some four years after he was born. Rojas withdrew from school in the ninth grade.

Following a sentencing hearing, the trial panel sentenced Rojas to death for aggravated murder (Count II), and to consecutive terms of imprisonment for the other offenses, with the exception of Count VI, which was merged with Count V. The court of appeals affirmed, and this appeal followed. On November 12, 1991, Rojas filed a pro se motion to withdraw his appeal and asked for an execution date. On January 22, 1992, this court denied Rojas' motion to withdraw his appeal.

Arthur M. Ney, Jr., Prosecuting Attorney, and William E. Breyer, for appellee.

H. Fred Hoefle, for appellant.

Herbert R. Brown, J.   R.C. 2929.05(A) requires a three-part analysis in capital cases. First, we must review the judgment and consider Rojas' claims of error. Second, we must independently weigh the evidence of aggravating circumstances and mitigating factors. Third, we must decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. For the reasons set forth below, we affirm the convictions and uphold the sentence of death.

I

Constitutional Issues

In proposition of law No. I, Rojas (for convenience, we will refer to claims by counsel as being made by Rojas although he personally wishes to withdraw the appeal) argues that the federal and Ohio Constitutions prohibit the execution of mentally retarded defendants and that since he is mentally retarded, he cannot be executed. The arguments lack legal and factual merit.

The United States Supreme Court has held that the United States Constitution does not forbid imposing the death penalty on mentally impaired defendants:

"* * * [M]ental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person * * * . So long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination whether 'death is the appropriate punishment' can be made in each particular case. * * *" Penry v. Lynaugh (1989), 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256, 292.

Nor does the Ohio Constitution exempt one who has a low intelligence from capital punishment. Mental capacity may be a mitigating factor entitled to weight in Ohio's sentencing scheme. However, we do not find, in this case or from empirical evidence generally, that a fixed correlation can be made between a defendant's level of intelligence and a defendant's moral culpability.

We have upheld the death penalty where the defendant had a low level of intelligence. See State v. Holloway (1988), 38 Ohio St.3d 239, 245-246, 527 N.E.2d 831, 838; State v. Jenkins

(1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.

Moreover, the record does not indicate that Rojas was mentally retarded. In his unsworn statement, Rojas admitted that he intentionally did poorly in answering questions so he would appear to be retarded. His admission is corroborated by the conclusions of three expert witnesses.

Dr. Michael F. Hartings, a clinical psychologist, could not formally test Rojas' mental capacity because Rojas refused the test. However, Hartings, after five hours of interviewing Rojas, concluded that Rojas had an IQ between eighty and ninety and was not retarded. Dr. Donald G. Beal, a clinical psychologist, agreed that Rojas was in the dull normal range of intellectual functioning and not retarded. Dr. Glenn M. Weaver, a forensic psychiatrist, noted that tests in Rojas' file indicated an IQ between sixty-seven and seventy-five, but he found Rojas functioning at a level of eighty-five to ninety. Hartings, Beal and Weaver all found that Rojas was malingering by making himself appear less intelligent than he is.

Dr. Robert Noelker, a clinical psychologist, and Mark Kroger, a counselling psychologist, found Rojas' intelligence to be at the lower end of the mildly retarded range. However, we agree with the trial court that the claims of Kroger and Noelker were not credible. The evidence of malingering seen by Hartings, Beal and Weaver is persuasive. Rojas worked successfully as a telephone operator. We find, as did the trial court, that Rojas' intelligence was above that of a retarded person. Thus, we reject Rojas' proposition of law No. I as unsupported in law or fact.

In proposition of law No. III, Rojas attacks the constitutionality of Ohio's death penalty statute by arguments we have previously rejected. State v. Beuke (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274, 285. See, also, State v. Bedford (1988), 39 Ohio St.3d 122, 132, 529 N.E.2d 913, 923; State v. Sowell (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309. Moreover, Rojas did not raise the subparagraph B, C and G issues at trial and hence waived them. State v. Awan (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus.

We also reject Rojas' propositions of law Nos. IV and V because we have previously sustained the constitutionality of Ohio's proportionality review. See State v. Combs (1991), 62 Ohio St.3d 278, 289, 581 N.E.2d 1071, 1080-1081; State v. Beuke, supra, at 37, 526 N.E.2d at 283; State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

In proposition of law No. VI, Rojas urges an equal protection claim on the ground that persons convicted of the murder of whites are more likely to receive the death penalty than those convicted of killing blacks. The record provides no basis for the claim, and Rojas did not preserve the issue for review. Moreover, both the United States Supreme Court and this court have rejected this claim. See McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262; State v. Zuern (1987), 32 Ohio St.3d 56, 512 N.E.2d 585, syllabus; State v. Beuke, supra, 38 Ohio St.3d at 37, 526 N.E.2d at 284.

II
Guilt Phase Issues

Sufficiency of Evidence

In proposition of law No. VII, Rojas argues that the evidence was insufficient to sustain the charged aggravated robbery offenses (Counts V and VI) as well as the death penalty specification alleging murder in the course of aggravated robbery. In his pretrial confession, Rojas admitted he took $25 from Becky's purse while in the apartment. However, Rojas now argues that he did so hours after he killed Becky; hence, no aggravated robbery occurred.

The state argues that a thief should not be rewarded because he commits his offense at a leisurely, methodical pace--killing his victim first and then stealing his property. We agree. In State v. Smith (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516, we noted:

"* * * [T]he victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching her die, and then stealing her property after the death. See State v. Jester (1987), 32 Ohio St.3d 147, 151-152, 512 N.E.2d 962, 968; Conrad v. State (1906), 75 Ohio St. 52, 78 N.E. 957."

In this case, the trial court reasonably could have found that the theft, or the intent to steal, occurred at the outset or during the one to three hours that Scott lived after being wounded. Rojas claims he stabbed Scott in the back at the outset, but no evidence exists as to when he stabbed her in the chest. Although Rojas claims that no evidence shows that he stabbed Scott with the intent of robbing her, he did steal from her. His intent to rob can be inferred from the fact that he did so. See State v. Lockett (1976), 49 Ohio St.2d 48, 3 O.O.3d 27, 358 N.E.2d 1062, reversed in part on other grounds, Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973.

Additionally, Rojas not only admitted he took the $25, he also thought about taking Scott's stereo, bloody clothing, and automobile, and he moved the stereo for that purpose. If Rojas intended to steal Scott's property while she was alive, the fact that he carried it away after she died is not crucial. See State v. Durr (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674, 682; State v. Smith, supra.

In a review for sufficiency, the evidence must be considered in a light most favorable to the prosecution. Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Davis (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930. The weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts. State v. Thomas (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356, syllabus; State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph two of the syllabus. Here there was "substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." State v. Eley (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

In proposition of law No. VIII, Rojas maintains that the evidence is insufficient to sustain convictions for rape and

aggravated burglary.  These claims lack merit.

In both pretrial statements, Rojas asserted that Scott was alive when he had intercourse with her.  The physical evidence corroborates the act of intercourse.  Police found Scott's nude body lying spread-eagled on the floor.  The coroner found evidence of semen in her vagina and of saliva on her nipples.  Additionally, the coroner estimated that Scott lived from one to three hours after the knife wounds were inflicted, and Rojas admitted she lived a couple of hours after he stabbed her.  Thus, the evidence establishes that Rojas raped her and that she was then alive.

The evidence of aggravated burglary based upon Rojas' unlawful entry into Scott's apartment is also compelling.  Although Rojas had previously been a guest, Scott rejected his request to meet at her apartment building.  Rojas confessed that he hid outside Scott's apartment and confronted her, with a knife in his hand, when she opened the apartment door to go to their prearranged meeting.  According to Rojas, Scott rejected his request to come into her apartment when he confronted her with the knife.  Thus, the evidence sustains both the rape and aggravated burglary offenses charged against Rojas.

In proposition of law No. IX, Rojas asserts that the capital specifications alleging murder in the course of aggravated burglary, rape, and aggravated robbery were not proven.  However, the evidence was sufficient to prove those offenses as discussed in propositions of law Nos. VII and VIII.

The evidence further established that Rojas killed Scott "while * * * [he] was committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * rape * * * aggravated robbery, or aggravated burglary * * * ."  R.C. 2929.04(A)(7).  In construing comparable language, we have recognized that the term "while" does not mean "simultaneously with," but only "associated with" or "as a part of one continuous occurrence."  State v. Smith, supra, 61 Ohio St.3d at 291, 574 N.E.2d at 517; State v. Cooey (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903.  As we stated in State v. Cooper (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736:

"The term 'while' does not indicate * * * that the killing must occur at the same instant as the attempted rape, or that the killing must have been caused by the attempt, but rather, indicates that the killing must be directly associated with the attempted rape  as part of  one continuous occurrence * * * ."

### Coerced Confessions

In proposition of law No. X, Rojas argues that his pretrial statements were involuntary because the police promised to provide him psychiatric assistance but did not do so.  Rojas did not raise this issue before the court of appeals and, thus, waived it.  State v. Williams (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

Moreover, the claim lacks merit.  At a pretrial hearing on his motion to suppress, Rojas testified that he told Denver Detective Sergeant Russell and Cheviot Police Chief Voss that he wanted to talk with a psychiatrist.  Rojas claims their promises to provide him assistance induced him to tell what

happened.  Admittedly, Rojas did not see a psychiatrist before he waived extradition and returned to Ohio.  However, neither officer explicitly promised immediate psychiatric assistance, as Rojas claims.

After listening to the conflicting testimony of Rojas and Police Chief Voss and reviewing all the evidence, the trial court made these findings:

"The Court finds that the police did not induce a confession by either coercion or promise.  In fact, the most favorable interpretation of the evidence for the defendant is his own statement at Page 20 of his interview with Chief Voss where defendant states, quote: You know the only reason why I'm telling you this is because my mom told me she said she'd stick by me and that she would keep the baby for me.  She told me not to lie.  She told me to tell everything about what happened, end of quote."

The evidence of record supports these trial court findings.  Rojas was fully advised of his rights and claims no other alleged coercion or violation of rights.  Accordingly, proposition of law No. X lacks merit.

### Effective Assistance of Appellate Counsel

In proposition of law No. XI, Rojas argues he did not receive the effective assistance of appellate counsel because counsel did not raise the issue of coerced confessions, as discussed in proposition of law No. X, before the court of appeals.  This proposition lacks merit.

Rojas was entitled to the effective assistance of appellate counsel on a first criminal appeal as of right.  Evitts v. Lucey (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821.  Counsel must exercise reasonable professional judgment in presenting an appeal.  See Jones v. Barnes (1983), 463 U.S. 745, 751, 103 S.Ct. 3308, 3312-3313, 77 L.Ed.2d 987, 993.  On appeal, the two-prong Strickland standard applies.  See Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; Smith v. Murray (1986), 477 U.S. 527, 535-536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434, 445; State v. Watson (1991), 61 Ohio St.3d 1, 16, 572 N.E.2d 97, 109-110.

However, appellate counsel performed adequately.  The trial court's explicit findings demonstrate that the coerced confession issue had little merit.  "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.  * * *"  Smith v. Murray, supra, at 536, 106 S.Ct. at 2667, 91 L.Ed.2d at 445.  Rojas failed to establish either part of the two-prong Strickland test, i.e., deficient performance by counsel or prejudice to essential rights.

### III

### Sentence Phase Issue

### Trial Court Sentencing Error

In proposition of law No. II, Rojas argues the trial court improperly considered the nature and circumstances of the offense as a nonstatutory aggravating circumstance.  However, the trial court's opinion precisely identified as aggravating circumstances the fact that the murder occurred in the course of an aggravated burglary, rape and aggravated robbery, and that Rojas was the principal offender.  The opinion listed no

other aggravating circumstances.

We reject Rojas' proposition. As we stated in State v. Wiles (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120:

"[W]here the court below correctly identifies the statutory aggravating circumstances pleaded and proven at trial, this court will infer that the trial court 'understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense.' State v. Sowell (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294, 1302."

The trial court is required to review the nature and circumstances of the offense to determine if they are a possible mitigating factor. As we noted in State v. Steffen, supra, 31 Ohio St.3d at 117, 31 OBR at 278, 509 N.E.2d at 390, "* * * By its statement on the gruesome and vicious nature of the murder, the trial court herein was merely justifying its conclusion that no mitigating factors can be gleaned from the nature and circumstances of this particular offense." Moreover, a three-judge panel "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." State v. Stumpf (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

IV

Our Independent Review

We find beyond a reasonable doubt that Rojas killed Rebecca Scott in the course of rape, aggravated burglary, and aggravated robbery. In independently considering the death penalty and possible mitigating factors, we find that the nature and circumstances of the offense offer no mitigating features. Rojas acted with prior planning, calculation and design to trap Scott as she left her apartment. Then he attacked her without mercy or hesitation. After stabbing her, he did nothing to get her medical attention. He allowed her to bleed to death in her bedroom while he raped and robbed her.

Rojas' history and background do warrant some weight in mitigation. Rojas suffers from "substance abuse" and "borderline" personality disorders. The evidence at trial categorized these disorders as mental diseases or defects. The evidence also established that Rojas took amphetamines and may have been intoxicated at the time of the offenses. Little evidence was presented at trial about Rojas' upbringing. Rojas did have psychological problems.

In considering statutory mitigating factors, we find that the evidence does not suggest that Scott "induced or facilitated" the offense within the meaning of R.C. 2929.04(B)(1). Nor was Rojas under any "duress, coercion, or strong provocation[,]" as set forth in R.C. 2929.04(B)(2).

The evidence is conflicting as to whether, at the time of the offense, Rojas "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law[.]" See R.C. 2929.04(B)(3). After considering the evidence, we conclude, as the trial court and court of appeals did, that this factor was not proved. The evidence does not support a conclusion that the defendant's criminal acts resulted from the defendant's low level of intelligence. However, we have considered his lower level of

intelligence as mitigating, albeit of slight weight in this crime. The defendant's history and background are entitled, at most, to modest mitigating weight.

Rojas was twenty-seven at the time of the offense, which negates youth as a mitigating factor under R.C. 2929.04(B)(4), and his prior history negates the factor of lack of a significant criminal history under R.C. 2929.04(B)(5). No other actors were involved; hence, R.C. 2929.04(B)(6) is inapplicable.

As to R.C. 2929.04(B)(7), "other factors," Rojas expressed remorse and sorrow for the offenses at trial. Rojas also assisted the police and confessed to the crime. His remorse and assistance to the police are mitigating factors.

When weighed, the aggravating circumstances outweigh the mitigating factors. Rojas committed aggravated burglary, aggravated robbery and rape in his deliberate and calculated quest to kill Rebecca Scott.

In this case, we conclude that the death penalty is appropriate and proportionate when compared with similar aggravated murder cases. State v. Franklin (1991), 62 Ohio St.3d 118, 580 N.E.2d 1; State v. Smith, supra; State v. Landrum (1990), 53 Ohio St.3d 107, 559 N.E.2d 710; State v. Lott (1990), 51 Ohio St.3d 160, 555 N.E.2d 293; State v. Henderson (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237; State v. Van Hook (1988), 39 Ohio St.3d 256, 530 N.E.2d 883; State v. Apanovitch (1987), 33 Ohio St.3d 19, 514 N.E.2d 394; State v. Steffen, supra.

Accordingly, we affirm the convictions and sentence, including the death penalty.

Judgment affirmed.

Moyer, C.J., Sweeney, Holmes, Douglas, Wright and Resnick, JJ., concur.