OPINION. *Page 2 
{¶ 1} Defendant-appellant Charles Finley appeals from his convictions, following a jury trial, for the murder and felonious assault of one-year-old Christopher Beck, Jr., the son of Finley's girlfriend, Diane Tucker. On the morning of September 21, 2005, Christopher played with Tucker's mother, Sherri Lester. Tucker then placed Christopher in Finley's care. And less than three hours later, Christopher showed signs of having been beaten and had sustained a fatal blow to his head.
 {¶ 2} Finley was indicted for aggravated murder with a death-penalty specification, murder under R.C. 2903.02(B), and felonious assault under R.C. 2903.11(A)(1). The jury acquitted Finley of aggravated murder, but convicted him of murder and felonious assault. The trial court imposed a mandatory prison term of 15 years to life for the murder conviction and ordered that the term be served consecutively to an 8-year prison term for the felonious-assault conviction.
 {¶ 3} Raising ten assignments of error, Finley now argues that (1) the trial court erred by refusing to instruct the jury on the lesser-included offense of involuntary manslaughter, (2) the trial court erred in failing to exclude testimony of the state's forensic dentist, (3) the trial court erred in imposing multiple sentences, (4) Finley was denied the effective assistance of counsel and was harmed by prosecutorial misconduct, (5) the trial court abused its discretion in regulating the trial and in the admission of evidence, and (6) Finley's convictions were contrary to the manifest weight of the evidence and were based upon insufficient evidence. We find none of the assignments to involve reversible error and thus affirm the trial court's judgment. *Page 3 
 The Murder of Christopher Beck, Jr. {¶ 4} Christopher was the son of Diane Tucker and Christopher Beck, Sr. Beck and Tucker attended Withrow High School together. Tucker was 18 and Beck was 17 when Christopher was born. Tucker and Beck ended their relationship after Christopher had been born, but both families remained involved in raising Christopher.
 {¶ 5} In January 2005, Tucker, then 20 years old, had begun attending classes at the University of Cincinnati. She and Christopher lived with her mother, Sherri Lester, in an apartment in the Kennedy Heights neighborhood of Cincinnati. While Tucker attended classes and worked at Proctor Gamble's Winton Hills facility, Beck's grandfather would watch Christopher in the morning and Lester would care for Christopher in the afternoon and in the evening.
 {¶ 6} Tucker then met Finley and began a relationship. Lester found letters Finley had sent to Tucker written while he was incarcerated in the Queensgate Correctional Facility. Lester disapproved of the relationship. In the summer of 2005, Finley was released from jail and began to see Tucker and Christopher. Lester noticed that Finley had begun to exert control over her daughter. Finley began driving Tucker's car, chauffeuring her to school and to work. He checked Tucker's cell phone, monitoring who she was talking to. Finley would not allow Tucker to see her friends without his permission. He was particularly jealous of Tucker's ongoing relationship with Beck's family.
 {¶ 7} Over time, Lester became more concerned about Tucker's relationship with Finley. She offered to quit her job to remain home to care for Christopher. Tucker refused the offer. *Page 4 
 {¶ 8} On September 20, 2005, Lester learned that, instead of using the Beck family, Tucker had permitted Finley to care for Christopher. Lester told her daughter that if she left Christopher in Finley's care again, she would contact 241-KIDS, Hamilton County's hotline to report suspected cases of child abuse or neglect.
 {¶ 9} That evening, Lester cared for Christopher in her apartment. Christopher was healthy and played until his bed time. When Tucker returned home near midnight, she took Christopher into her bedroom. Lester fed Christopher at 4:00 a.m. She played with Christopher while Tucker prepared for work. Christopher played normally and had no visible signs of injury. As Tucker prepared to leave for work, she informed Lester that Lester's niece would be caring for Christopher that morning.
 {¶ 10} Instead of taking Christopher to Lester's niece, Tucker met Finley outside the apartment. He had spent the night in the basement of Lester's apartment. He drove Tucker's car and delivered her to work at 7:00 a.m. Christopher remained in Finley's care. Finley and Christopher returned to Lester's apartment. Using keys provided by Tucker, Finley entered the apartment and spent two hours alone with Christopher.
 {¶ 11} After 10:00 a.m., Finley left Lester's apartment with Christopher and travelled to his mother's apartment in Mt. Auburn. As Finley carried Christopher into the apartment, Pam Slaughter, Finley's mother, thought that Christopher was asleep. Finley placed Christopher on Slaughter's couch. Slaughter cautioned Finley not to leave Christopher unattended. He picked Christopher up and carried him into the bedroom. Slaughter became alarmed because Christopher was not breathing.
 {¶ 12} Slaughter called for emergency assistance by dialing 911. The emergency operator instructed Finley how to perform cardiopulmonary resuscitation on Christopher. Paramedics also attempted to revive Christopher, but he was pronounced dead shortly *Page 5 
after his arrival at Children's Hospital. The hospital staff reported to the police the suspicious nature of Christopher's death.
 {¶ 13} An autopsy revealed extensive injuries over his entire body. Christopher suffered contusions to his spine, neck, chest, buttocks, both thighs, and both arms. And he may have been shaken or swung by his arms or chest. Christopher also had an unusual mark on his right buttock. At trial, the state's forensic dentist testified that the mark was caused by a bite made by Finley.
 {¶ 14} Christopher sustained a severe blunt-trauma injury to the right side of his head. The blow fractured his skull along the entire length of the right parietal bone. That injury resulted in brain hemorrhaging and was the cause of his death. The assistant coroner testified that these injuries could not have been caused by Christopher failing from a bed onto a floor. She compared the energy required to cause the fatal head wound to "a major impact like you'd swing a baseball bat." Based on the nature of the head wound, the coroner opined that the wound had resulted when Christopher's head had been swung at a great rate and struck a fixed object. The fatal injury would have resulted in immediate unconsciousness and was inflicted within two hours of death.
 {¶ 15} Police investigators interviewed Tucker, Lester, Slaughter, and Finley. In his initial statement to police, Finley stated that Christopher had acted normally while in his care. In a subsequent statement, he told police that he remembered that Christopher had fallen off of the bed during the morning.
 Weight and Sufficiency of the Evidence {¶ 16} In his first assignment of error, Finley challenges the weight and the sufficiency of the evidence adduced to support his convictions. A review of the record fails *Page 6 
to persuade us that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[1] The jury was entitled to reject Finley's theory that only circumstantial evidence linked him to the death of Christopher, and that Lester and Tucker had conspired to blame him for Christopher's death. Finley's forensic pathologist testified that some of the injuries on Christopher's body were quite old and that Christopher could have sustained the fatal blow up to seven hours before death.
 {¶ 17} But the state could use circumstantial evidence to prove its case.[2] And the weight to be given the evidence and the credibility of the witnesses were primarily for the jury as the trier of fact to determine. In resolving conflicts in the testimony, the jury could have found that Christopher had been in good health when he left Lester's apartment in Finley's care, that he had been unconscious and near death when he arrived at Slaughter's home, and that Finley had caused those injuries.[3]
 {¶ 18} The test for the sufficiency of the evidence required to sustain a conviction was enunciated by the United States Supreme Court in Jackson v. Virginia.[4] The relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[5]
 {¶ 19} The record reflects substantial, credible evidence from which the jury could have reasonably concluded that all the elements of the charged crime, including that *Page 7 
Finley had killed Christopher, had been proved beyond a reasonable doubt. Therefore, the assignment of error is overruled.
 Lesser-Included-Offense Instruction {¶ 20} In his second assignment of error, Finley contends that the trial court erred in denying his request for jury instructions on involuntary manslaughter and child endangering. He argues that due process required the trial court to instruct the jury on these lesser offenses. The trial court rejected his proposed instructions after finding that involuntary manslaughter is not a lesser-included offense of felony murder.
 {¶ 21} Finley was indicted for and convicted of felony murder under R.C. 2903.02(B), which proscribes causing the death of another as a proximate result of committing an offense of violence that is a felony of the first or second degree. The predicate offense of violence was felonious assault under R.C. 2903.11(A)(1), which proscribes knowingly causing serious physical harm to another.
 {¶ 22} In his proposed jury instructions, Finley urged the trial court to instruct the jury on involuntary manslaughter under R.C. 2903.04(A), which states that it is an offense to cause the death of another as a proximate result of committing a felony. Finley offered child endangering under R.C. 2919.22(A) as the predicate felony offense for the involuntary manslaughter charge. R.C. 2919.22(A) provides that "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 23} A trial court may enter a judgment of conviction on an offense that is a lesser-included offense, an offense of an inferior degree, or an attempt to commit the *Page 8 
greater charged offense.[6] This court follows a two-pronged test to determine whether a jury instruction on a lesser-included offense is warranted.
 {¶ 24} First, the trial court must determine whether the offense in the requested instruction is a lesser-included offense of the charged crime by comparing their statutory elements. An offense may be a lesser-included offense of another only if (1) the offense carries a lesser penalty than the other, (2) the offense of the greater degree cannot, as statutorily defined, ever be committed without the offense of the lesser degree also being committed, and (3) some element of the greater offense is not required to prove the commission of the lesser offense.[7] This portion of the lesser-included-offense analysis requires the offenses at issue to be examined "as statutorily defined and not with reference to specific factual scenarios."[8]
 {¶ 25} Following the Ohio Supreme Court's decision in State v.Lynch, [9] we held that involuntary manslaughter under R.C. 2903.04(A) is a lesser-included offense of felony murder.[10] Thus, the trial court incorrectly concluded otherwise.
 {¶ 26} But even if one offense is a lesser-included offense of another, the requested instruction must be given "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."[11]
 {¶ 27} Here, under the second prong of our analysis, the failure to instruct on the involuntary manslaughter offense was not error. The evidence indicated that Christopher *Page 9 
had been beaten from head to toe and had suffered a severe blunt-force injury to his head. Based on this evidence, no jury could have reasonably concluded that Finley had inflicted these injuries in a reckless or careless manner. They are the result of purposeful conduct. As the evidence does not reasonably support an acquittal for felony murder and a conviction on the lesser-included offense, Finley was not entitled to the instruction.
 {¶ 28} We hold that while the trial court incorrectly determined that involuntary manslaughter is not a lesser-included offense of felony murder, given the evidence presented at trial, it was not error to fail to instruct the jury on involuntary manslaughter. The second assignment of error is overruled.
 The Admission of Dental-Expert Evidence {¶ 29} Finley next contends that the trial court erred in construing EvidR. 702 and thus erred in failing to exclude the testimony of the state's forensic-dentist expert witness. He claims that the state's expert witness, Franklin D. Wright, Jr., D.D.S., did not follow established forensic-dentistry protocols, and thus that his testimony that Christopher had human bite marks on his right buttocks and that the marks had been made by Finley was unreliable. Finley raised this issue in a pretrial motion in limine. In a hearing on the motion to exclude Dr. Wright's proposed testimony, Finley's forensic-dentistry expert, Richard Souviron, D.D.S., testified that he would have employed a different protocol than that used by Dr. Wright. Following the hearing, the trial court determined that Dr. Wright's testimony was reliable and denied the motion.
 {¶ 30} While announcing its ruling, the trial court noted the interlocutory nature of a motion in limine, informing Finley that it was "looking at this in a vacuum" and that *Page 10 
its ruling was "preliminary only." We note that in the state's case-in-chief, Dr. Wright's evidence was offered without objection to its reliability.[12]
 {¶ 31} As this court has noted, "[a] ruling on a motion in limine reflects the court's anticipated treatment of an evidentiary issue at trial, and as such it is a tentative, interlocutory, and precautionary ruling. In deciding such motions, the trial court is at liberty to change its ruling on the disputed evidence in the actual context of the trial. * * * It is incumbent, therefore, upon the party aggrieved by a ruling on a motion in limine to raise the issue at trial, at which point finality attaches to the trial court's decision and the issue is preserved for appeal."[13] No reviewable error results from the denial of a motion in limine unless the proponent of the evidence later offers it at trial, the opponent objects, and the trial court erroneously overrules the objection.[14] Thus, absent plain error in the trial court's admission of Dr. Wright's testimony, this issue has been waived.[15] An error rises to the level of plain error only where it is both obvious and outcome-determinative.[16]
 {¶ 32} "Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion. * * * In general, courts should admit such testimony when material and relevant, in accordance with EvidR. 702 * * *."[17]
Evid. R. 702 permits a witness to testify as an expert when (1) the witness's testimony relates to matters beyond the knowledge or experience of a layperson, (2) the witness has specialized knowledge, skill, experience, training, or education regarding the *Page 11 
subject matter of his or her testimony, and (3) the witness's testimony is based on reliable scientific, technical, or specialized information. "When applying the third prong of EvidR. 702, the court must act as a `gatekeeper' to ensure that the proffered scientific, technical, or other specialized information is sufficiently reliable."[18] Whether an expert's opinion is admissible depends on whether the principles and methods employed by the expert to reach that opinion are reliable, and not "whether his conclusions are correct. "[19] The credibility to be afforded the expert's conclusions remains a matter for the trier of fact.[20]
 {¶ 33} It is beyond dispute that Dr. Wright had the specialized knowledge, experience, training, and education to qualify him as an expert on forensic dentistry. There is also no dispute that his testimony related to matters beyond the knowledge and experience of layperson. And since Dr. Souviron was unable to testify that Dr. Wright's protocols were unreliable, the trial court did not commit plain error in admitting Dr. Wright's testimony identifying Finley as the person who had inflicted the bite on Christopher's body. While Finley's trial counsel failed to object to this testimony, they offered Dr. Souviron's testimony at trial and vigorously cross-examined Dr. Wright. The fourth assignment of error is overruled.
 {¶ 34} Finley next argues that the trial court erred in failing to exclude Dr. Wright's testimony because the state had not disclosed a PowerPoint presentation that Dr. Wright used to illustrate for the jury his conclusion that Finley had inflicted the bite mark on Christopher's buttocks. We disagree.
 {¶ 35} Crim. R. 16(B)(1)(c) generally requires disclosure of all documents and tangible objects in the possession of the state "which * * * are intended for use by the *Page 12 
prosecuting attorney as evidence at the trial." And Crim.R 16(B)(1)(d) requires disclosure of "any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, * * * within the possession, custody or control of the state."
 {¶ 36} "The Ohio Rules of Criminal Procedure give the trial court discretion to fashion a remedy for discovery violations that occur during trial. Since the trial court is in the best position to determine whether a mistrial is needed, the decision to grant or deny a motion for a mistrial rests within the sound discretion of the trial court."[21]
 {¶ 37} Finley maintains that the state had not provided a copy of Dr. Wright's PowerPoint presentation, marked and initially admitted as state's exhibit 20, before he used the presentation on direct examination in conjunction with properly admitted acetate overlays to match Finley's bite pattern to the marks on Christopher. The state contended that it had complied with Crim. R. 16 when it had disclosed all the information that Dr. Wright had used to prepare the presentation.
 {¶ 38} The trial court conducted a thorough hearing, outside the presence of the jury. It entertained extensive argument by counsel, continued the matter over a weekend to permit counsel to review the material actually disclosed by the state, and conducted a separate voir dire of Dr. Wright. The trial court found that the state had disclosed all the information that Dr. Wright had used to prepare the presentation. It concluded that the presentation was not a separate report or tangible document discoverable under Crim.R 16, but was, in effect, demonstrative evidence used to aid the jury's consideration of Dr. Wright's testimony. The trial court then reversed its prior ruling admitting the *Page 13 
presentation as evidence and ordered that it not be given to the jury during its deliberation.
 {¶ 39} Here, Finley was adequately informed of the bite-mark-comparison evidence that would be used against him at trial. "Crim. R. 16(B) does not require the prosecution to disclose to the defendant the significance to the * * * information sought * * * by the defendant," or "how it intends to use [the] work sought to be discovered by the defense."[22] The trial court did not err in permitting Dr. Wright to testify using the presentation as demonstrative evidence or in fashioning a remedy for any perceived unfairness to Finley by limiting the jury's access to the presentation. The third assignment of error is overruled.
 Allied Offenses of Similar Import {¶ 40} In his fifth assignment of error, Finley argues that the crimes for which he was convicted — felony murder and felonious assault — are allied offenses of similar import, because they are derived from the same course of conduct. R.C. 2941.25, Ohio's multiple-counts statute, clearly indicates the General Assembly's intent to permit cumulative sentencing for the commission of certain offenses.[23] If, however, the offenses are of similar import, the defendant may be convicted of only one, unless the offenses are committed separately or with a separate animus as to each.[24]
 {¶ 41} When considering whether offenses are of similar import under R.C. 2941.25(A), a court must "compare the elements of the offenses in the abstract, without considering the evidence in the case, but are not required to find an exact alignment of the *Page 14 
elements. Instead, if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in commission of the other, then the offenses are allied offenses of similar import. "[25]
 {¶ 42} Here, felony murder under R.C. 2903.02(B) requires causing death while committing an offense of violence, while felonious assault requires knowingly causing serious physical harm to another. Comparing the elements of these offenses in the abstract, one can commit a felony murder without committing felonious assault, and vice versa. Clearly, the commission of felonious assault will not necessarily result in a felony murder. Therefore, felony murder and felonious assault are not allied offenses of similar import. Because the offenses are not allied offenses of similar import, multiple convictions were permitted.
 {¶ 43} Moreover, this court has previously rejected the contention, asserted by Finley here, that a felonious-assault conviction must be merged with felony murder where the assault was the predicate offense to the felony-murder conviction.[26] The fifth assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 44} Finley next asserts that he was denied the effective assistance of counsel for various claimed failures, including admitting autopsy photos into evidence to support the testimony of the defense's own forensic pathologist, failing to object to Lester's testimony that she had informed Tucker that she would contact 241-KIDS if Tucker placed Christopher in Finley's care, attempting to admit and then withdrawing a report from a *Page 15 
witness who ultimately did not testify at trial, and failing to introduce the curriculum vitae of Dr. Souviron. The assignment of error is feckless.
 {¶ 45} To prevail on a claim of ineffective assistance of trial counsel, an appellant must show, first, that trial counsel's performance was deficient and, second, that the deficient performance was so prejudicial that he was denied a reliable and fundamentally fair proceeding.[27] A reviewing court will not second-guess trial strategy and must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[28]
 {¶ 46} Here, both of Finley's experienced trial counsel worked vigorously to discredit the state's theory of the case and conducted a spirited defense. They succeeded to a large degree, in that Finley was acquitted of aggravated murder. After reviewing the entire record, we hold that counsel's efforts were not deficient, and that Finley was not prejudiced in any way. The result of the trial was reliable and fundamentally fair. The sixth assignment of error is overruled.
 Other Evidentiary Issues {¶ 47} Finley's seventh assignment of error, in which he claims that the admission of a photograph of Christopher taken during his birthday party was inflammatory and deprived Finley of a fair trial, is overruled. EvidR. 403 excludes relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice." Whether to exclude evidence is consigned to the sound discretion of the trial court.[29] The trial court *Page 16 
did not abuse its discretion in this case. In light of the graphic evidence introduced at trial, the admission of this single photo was not unfairly prejudicial to Finley.
 Prosecutorial Misconduct {¶ 48} Finley next asserts that the prosecutor engaged in numerous violations of Finley's right to a fair trial by withholding discovery material relating to Dr. Wright's testimony, in eliciting hearsay testimony from Lester, in informing the jury of Finley's criminal past, and in admitting prejudicial photos of Christopher's birthday party.
 {¶ 49} The test for whether prosecutorial misconduct mandates reversal is whether the state's remarks or actions were improper, and if so, whether they prejudicially affected a substantial right of the accused.[30] The central element of prosecutorial-misconduct analysis is "whether the conduct complained of deprived the defendant of a fair trial."[31]
 {¶ 50} In light of our resolution of the third and seventh assignments of error, the failure to disclose discovery material and the admission of the birthday photo were not improper. Since Finley did not object to Lester's testimony that she had threatened to call 241-KIDS, our review is limited to whether the prosecutor's actions rose to the level of plain error.[32] We are not convinced that, but for the admission of this testimony, Finley would not have been convicted. As the jury had already learned that Tucker and Finley had met while he was incarcerated in the Queensgate facility, Finley was not harmed by the prosecutor's remarks. Since the trial court sustained Finley's objections to the other challenged testimony or remarks, the eighth assignment of error is overruled. *Page 17 
 Other Trial Errors {¶ 51} Finley next contends that the trial court erred by refusing the jury's request during deliberations for a reading of the trial testimony of Lester and Tucker. After discussing the request with counsel for Finley and the state, the trial court instructed the jurors to rely on their collective recollection of the testimony. The question whether to reread testimony to the jury is consigned to the sound discretion of the trial court.[33] We find no abuse of that discretion in the trial court's refusal to reread testimony to the jury. The ninth assignment of error is overruled.
 Cumulative Error {¶ 52} Finally, in his tenth assignment of error, Finley contends that the cumulative effect of alleged errors deprived him of a fair trial. The assignment of error is without merit. Although we have determined that there were errors that were harmless, we conclude that, even when considered in the aggregate, these errors did not "become prejudicial by sheer weight of numbers" and thus deprive Finley of his right to a fair trial.[34] The tenth assignment of error is overruled.
 {¶ 53} Therefore, the judgment of the trial court is affirmed.
Judgment affirmed.
HILDEBRANDT, P.J., and HENDON, J., concur.
[1] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[2] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.
[3] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[4] (1979), 443 U.S. 307, 99 S.Ct. 2781.
[5] See id. at 319; see, also, State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, 842 N.E.2d 996, at ¶ 36.
[6] See State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph one of the syllabus; see, also, R.C. 2945.74.
[7] See State v. Deem, 40 Ohio St.3d 205, paragraph three of the syllabus; see, also, State v. Smith, 117 Ohio St.3d 447, 2008-Ohio-1260,884 N.E.2d 595, ¶ 9.
[8] State v. Barnes, 94 Ohio St.3d 21, 26, 2002-Ohio-68,759 N.E.2d 1240; see, also, State v. Smith, 117 Ohio St.3d 443, at ¶ 9.
[9] 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 79.
[10] See State v. Brundage, 1st Dist. No. C-030632, 2004-Ohio-6436, ¶ 9.
[11] State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; see, also, State v. Johnson,112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 269.
[12] Finley's only contemporaneous objection to Dr. Wright's testimony was made to assert that the state had failed to disclose evidence used by Dr. Wright. This objection is the subject of our subsequent treatment of Finley's third assignment of error.
[13] State v. Clowers (1999), 134 Ohio App.3d 450, 454,731 N.E.2d 270; see, also, State v. Brown (1988), 38 Ohio St.3d 305,528 N.E.2d 523, paragraph three of the syllabus; State v. Grubb (1986),28 Ohio St. 3d 199, 201-202, 503 N.E.2d 142, paragraph two of the syllabus.
[14] See State v. Hill, 75 Ohio St.3d 195, 203, 1996-Ohio-222,661 N.E.2d 1068.
[15] See Evid. R. 103(A)(1) and 103(D); Crim. R. 52(B).
[16] See State v. Lewis, 1st Dist. Nos. C-050989 and C-060010,2007-Ohio-1485, ¶ 39.
[17] Terry v. Caputo, 115 Ohio St.3d 351. 2007-Ohio-5023,875 N.E.2d 72, ¶ 16-22; see, also, Miller v. Bike Athletic Co., 80 Ohio St.3d 607,611, 1998-Ohio-178, 687 N.E.2d 735.
[18] State v. Rangel (2000), 140 Ohio App.3d 291, 295,747 N.E.2d 291.
[19] Miller v. Bike Athletic Co., 80 Ohio St.3d at 611.
[20] State v. Nemeth, 82 Ohio St.3d 202, 211, 1998-Ohio-376,694 N.E.2d 1332.
[21] State v. Person, 174 Ohio App.3d 287, 2007-Ohio-6869,881 N.E.2d 924, ¶ 12 (internal citations omitted).
[22] State v. Parker (1990), 53 Ohio St.3d 82, 87,558 N.E.2d 1164.
[23] See State v. Rance, 85 Ohio St.3d 632, 635-636, 1999-Ohio-291,710 N.E.2d 699.
[24] See id. at 636, 1999-Ohio-291, 710 N.E.2d 699.
[25] State v. Cabrales, 118 Ohio St.3d 54, 2008-Ohio-1625,886 N.E.2d 181, paragraph one of the syllabus.
[26] See State v. Pickett, 1st Dist. No. C-000424, 2001-Ohio-4022; see, also, State v. Campbell, 90 Ohio St.3d 320, 2000-Ohio-183,738 N.E.2d 1178; State v. Carroll, 12th Dist. Nos. CA2007-02-030, CA2007-03-041, 2007-Ohio-7075, ¶ 100-102.
[27] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; Lockhart v. Fretwell (1993), 506 U.S. 364, 369-370, 113 S.Ct. 838;State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.
[28] See State v. Mason, 82 Ohio St.3d 144, 157-158, 1998-Ohio-370,694 N.E.2d 932.
[29] See State v. Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391,819 N.E.2d 215, ¶ 107.
[30] See State v. Bey, 85 Ohio St.3d 487, 493, 1999-Ohio-283,709 N.E.2d 484.
[31] State v. Fears, 86 Ohio St.3d 329, 332, 1999-Ohio-111,715 N.E.2d 136, citing State v. Apanovitch (1987), 33 Ohio St.3d 19, 24,514 N.E.2d 394.
[32] See Crim. R. 52(B).
[33] See State v. Berry (1971), 25 Ohio St.2d 255, 267 N.E.2d 775, paragraph four of the syllabus; see, also, State v. Leonard,104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 123.
[34] State v. Yarbrough, 104 Ohio St.3d 1, 2004-Ohio-6087,817 N.E.2d 845, ¶ 112, quoting State v. Hill, 75 Ohio St.3d 195, 212,1996-Ohio-222, 661 N.E.2d 1068. *Page 1