DECISION ON RECONSIDERATION. *Page 2 
{¶ 1} Defendant-appellant, Ryan Dieterle, appeals convictions for aggravated murder under R.C. 2903.01(B), aggravated burglary under R.C. 2911.11(A)(1), rape under R.C. 2907.02(A)(2), and violation of an anti-stalking protection order under R.C. 2919.27(A). We find no merit in his five assignments of error, and we affirm the trial court's judgment.
 I. Facts {¶ 2} Evidence presented at a jury trial showed that Dieterle and his wife, Michelle, began having marital problems after Michelle was kidnapped, robbed, and raped by an armed stranger. They eventually separated, with Michelle remaining in the parties' Blue Ash apartment and Dieterle living with his parents. They both began dating other people. Michelle began seeing Richard Banks, an old boyfriend.
 {¶ 3} Michelle also obtained a temporary protection order against Dieterle because of his violent behavior, although she did continue to have contact with him. In conjunction with that order, he was placed on an electronic monitoring unit ("EMU").
 {¶ 4} Before the murder, Dieterle was employed at a Jiffy Lube store in Blue Ash. Dieterle told a coworker, "[F]uck that bitch, I could kill her." He also asked two other coworkers if they had "ever hated someone so much they could kill them, but then cry over their body?"
 {¶ 5} Several weeks before the murder, Dieterle and a coworker, Travis Thornton, arranged to set off an alarm at Jiffy Lube. As the assistant manager of the store, Dieterle had the responsibility to check on the alarm, which gave him an excuse to violate the terms of his EMU agreement. He left his parents' house at about midnight, but instead of going to Jiffy Lube, he went to Michelle's apartment. *Page 3 
 {¶ 6} Dieterle did not have keys to the apartment because the locks had been changed. He went to the rear of the building, climbed three stories to the balcony of Michelle's apartment, and looked in the windows. He then climbed down and returned to the car, and he and Thornton left the area.
 {¶ 7} On the night of the murder, at approximately 3:00 a.m., Dieterle left his parents' home. He drove to Michelle's apartment and parked his car. After he got out of the car, he removed his shoes and socks. He went to the rear of the building and climbed up the three stories to Michelle's balcony. He entered the apartment through an unlocked window.
 {¶ 8} Earlier in the evening, Michelle had invited Banks to her apartment, and he spent the night with her. At approximately 3:00 a.m., while she and Banks were sleeping, Dieterle jerked off the covers, exclaiming, "What the fuck?" At the time, Michelle was wearing underwear, sweat pants, and a tee shirt.
 {¶ 9} Dieterle demanded that Banks leave. Banks stated that Dieterle appeared upset but not out of control. Banks left the bedroom for a brief time while Dieterle and Michelle spoke. After they came out, Banks got dressed and prepared to leave. Both Dieterle and Michelle appeared calm, and Michelle told Banks that it was okay for him to leave.
 {¶ 10} Banks told her that we would call in a few minutes and that he would call the police if any trouble occurred. As he left the apartment, he heard the dead bolt lock. After about ten minutes, he called Michelle. When she did not answer the phone, he called the police.
 {¶ 11} The police found Michelle's partially clothed and mutilated body on the floor of her living room, with two knives lying nearby. Her wounds indicated a savage attack. She sustained the following injuries: (1) two black eyes and injuries to her mouth; (2) knife wounds to her face and neck, including saw-like injuries resulting from *Page 4 
back-and-forth motions on her neck; (3) severe knife wounds to her abdomen, which left her internal organs protruding; (4) multiple knife wounds to her back; (5) lacerations to her vagina caused by a knife; and (6) a massive laceration to her rectum and adjacent areas, indicative of a knife being forced into her rectum. Additionally, her body had marks indicating that it had been pulled across the floor and carpet.
 {¶ 12} The police also found Dieterle naked and covered with blood. He had knife wounds on his neck and hands. The knife block where the knives had come from had blood stains on it that matched his blood. When Dieterle regained consciousness, a police officer asked him what had happened. He stated, "She cut me." A pathologist from the coroner's office testified that his wounds were self-inflicted.
 {¶ 13} Dieterle contended that he had acted in self-defense. He claimed that Michelle had attacked him with the knife first. He presented the testimony of a pathologist who said that his wounds were defensive wounds.
 II. Expert Testimony and Harmless Error {¶ 14} In his first assignment of error, Dieterle contends that the trial court erred in allowing improper expert testimony into evidence. He argues that, without the improper testimony, the state's evidence was insufficient to prove the rape and the aggravated-murder charge based upon the rape. This assignment of error is not well taken.
 {¶ 15} We first note that Dieterle did not object to all of the testimony that he now argues was improper. Therefore, we could only reverse his convictions if we found plain error.[1] Further, even if some of the testimony that Dieterle had objected to was technically improper, any error was most certainly harmless. *Page 5 
 {¶ 16} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body, or any instrument, apparatus, or other object into the vaginal or anal opening of another."
 {¶ 17} All of the allegedly improper testimony occurred during the testimony of the coroner who had conducted the autopsy on Michelle's body. Further, it all focused on a particular contusion in her vagina. But Michelle suffered numerous injuries to her vagina. Though defense counsel focused on the contusion at trial, it was actually a side issue.
 {¶ 18} The coroner also testified that Michelle had suffered a laceration caused by a sharp instrument on her left thigh coming from the vagina. That laceration continued into the vagina. It was "carved" in a way that indicated movement, meaning that she was alive when it was inflicted. The coroner testified to a reasonable degree of medical certainty that a knife or sharp object penetrated the victim's vagina. Further, the knife caused the injury on Michelle's thigh when it was coming out of the vagina, because the laceration was deeper inside the vagina than outside.
 {¶ 19} The state's contention was always that Dieterle had raped Michelle with a knife. The coroner's testimony about the vaginal laceration was sufficient to prove the elements of rape.[2] Even if the admission of some of the testimony about the contusion was erroneous, no possibility existed that it contributed to Dieterle's convictions. That testimony was a minimal part of the state's overall case, and the evidence against *Page 6 
Dieterle was otherwise overwhelming. Under the circumstances, we hold that any error was harmless, [3] and we overrule Dieterle's first assignment or error.
 III. Jury Instruction on Rape {¶ 20} In his second assignment of error, Dieterle contends that the trial court erred by failing to properly and completely instruct the jury. He argues that it should have instructed the jury that, to sustain a rape conviction, the state had to prove beyond a reasonable doubt that the victim was alive when the sexual conduct began. This assignment of error is not well taken.
 {¶ 21} We note that although Dieterle argued the issue extensively while making a Crim. R. 29 motion for a judgment of acquittal, he never specifically requested the instruction, and he did not object when the court failed to give such an instruction. Consequently, we can reverse only upon a finding of plain error.[4]
 {¶ 22} A trial court must fully and completely give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and to discharge its duty as the fact-finder.[5] An appellate court will not reverse a conviction due to improper jury instructions unless the defendant was prejudiced.[6] A single instruction cannot be judged in isolation, but must be viewed in the context of the overall charge.[7]
 {¶ 23} The law on this issue is far from clear. We have never specifically addressed it. Dieterle relies on State v. Smith, [8] in which we held that the state had *Page 7 
presented evidence showing that the victim was alive when the sexual conduct started. We did not address whether a live victim was an essential element of rape or whether the trial court needed to instruct the jury on that element.
 {¶ 24} In State v. Rojas, [9] the defendant was convicted of aggravated murder predicated upon aggravated robbery and a death-penalty specification alleging that the murder had been committed in the course of aggravated robbery. The defendant argued that he could not have been convicted of aggravated robbery because the victim had been dead several hours before he took money from her purse.
 {¶ 25} The Ohio Supreme Court rejected this argument, stating, "The state argues that a thief should not be rewarded because he commits his offense at a leisurely, methodical pace — killing his victim first and then stealing his property. We agree."[10] It went on to state, "[T]he victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation. A robber cannot avoid the effect of the felony-murder rule by first killing a victim, watching her die, and then stealing her property after the death."[11] The court went on to point out that if the defendant intended to steal the victim's property while she was alive, the fact that he carried it away after she died is not crucial.[12] This logic is also applicable to felony murder predicated on rape.
 {¶ 26} Additionally, we find the logic of Tenth Appellate District inState v. Collins[13] to be compelling. In that case, the defendant and his companions had viciously beaten, choked, and raped the victim, who died at some point during the assault. The defendant, relying on R.C. 2927.01, the abuse-of-a-corpse statute, argued that his rape *Page 8 
conviction was against the manifest weight of the evidence because the victim had been dead at the time of the rape. The court rejected that argument.
 {¶ 27} The court began by examining the evidence and concluding that the state had failed to prove that the victim was alive at the time of the sexual conduct.[14] It pointed out that the rape statute does not explicitly require a living victim. It went on to state that "[m]ore important, we conclude that the existence of the abuse of corpse statute does not indicate that the legislature intended conduct like defendant's and his companions' to fall outside the scope of the rape statute. Even though the victim died during the incident in the present case, defendant's conduct, when viewed in its entirety, involved `indignities' to the living,' unlike the conduct that R.C. 2927.01 contemplates. "[15]
 {¶ 28} The court noted that the defendant had engaged in sexual conduct with the victim only after he had compelled the still-living victim to submit by force. "The fact the force was sufficient to kill the victim does not lessen the seriousness of the defendant's actions."[16] It pointed out that the case before it differed "fundamentally from a case in which one happens upon the corpse of a female and engages in sexual intercourse with it."[17]
 {¶ 29} Finally, the court held that "the fact that the victim may have been dead when the sexual conduct occurred does not, in itself, lessen defendant's culpability herein, nor does the state have to prove in this case, as an element of the offense of rape, that the victim was alive when the sexual conduct occurred."[18] We agree with the court's reasoning.[19]
 {¶ 30} Applying the reasoning of these cases to the present case, we hold that the state did not have to prove that Michelle was alive when the sexual conduct began. *Page 9 
Consequently, the trial court did not have to instruct the jury to that effect. The trial court fully instructed the jury on all the elements of rape. The evidence showed that Michelle was alive at the time Dieterle compelled her to submit by force or threat of force. Therefore, the evidence was sufficient to support the rape conviction.
 {¶ 31} We cannot hold that the court's failure to give the instruction was error, much less plain error. To accept Dieterle's argument would be to reward him for using enough force to kill the victim rather than just to harm her, a result that we would find unconscionable.
 {¶ 32} We also note that, even if the court's failure to give the instruction had been error, Dieterle would not have been prejudiced. During its deliberations, the jury specifically asked, "To be considered rape, must the victim be alive?" The trial court answered "yes." Consequently, we overrule Dieterle's second assignment of error.
 IV. Abuse of a Corpse — Lesser-Included Offense {¶ 33} In his third assignment of error, Dieterle contends that the trial court should have instructed the jury on abuse of a corpse under R.C. 2927.01 as a lesser-included offense of rape. He argues that in the absence of proof that the victim was alive when the sexual conduct began, an instruction on abuse of a corpse was proper. This assignment of error is not well taken.
 {¶ 34} The Ohio Supreme Court has adopted a two-pronged test to determine whether a jury instruction on a lesser-included offense is warranted. First, a court must determine whether the offense in the requested instruction is a lesser-included offense of the charged crime by comparing their statutory *Page 10 
elements in the abstract.[20] An offense may be a lesser-included offense of another if (1) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, be committed without the lesser offense also being committed; and (iii) some element of the greater offense is required to prove the commission of the lesser offense.[21]
 {¶ 35} R.C. 2927.01(A) provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that the person knows would outrage reasonable family sensibilities." R.C. 2927.01(B) states that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." This statute prohibits conduct such as "copulating with or otherwise mistreating a corpse."[22]
 {¶ 36} An accused can commit rape, as defined in R.C. 2907.02(A)(2), without also committing abuse of a corpse under subsection (A) or (B) of R.C. 2927.01. Consequently, abuse of a corpse is not a lesser-included offense of rape, which Dieterle has essentially acknowledged.
 {¶ 37} Because abuse of a corpse is not a lesser-included offense of rape, we need not go to the second prong of the test and consider whether the evidence supported the instruction.[23] Because Dieterle was not charged with abuse of a corpse, the trial court was not required to instruct the jury on that offense. Consequently, we overrule his third assignment of error. *Page 11 
 V. Cumulative Error {¶ 38} In his fourth assignment of error, Dieterle contends that the cumulative effect of errors warranted a new trial. The cumulative effect of errors may deprive a defendant of a fair trial, even though individual instances of error do not warrant reversal.[24] The defendant must demonstrate that a reasonable probability exists that the outcome of the trial would have been different absent the alleged errors.[25]
 {¶ 39} Dieterle has not demonstrated that, but for any errors by the trial court, the outcome of the trial would have been different. Any error in the admission of expert testimony was harmless, and the evidence that Dieterle committed this extremely brutal murder, while also committing aggravated burglary and rape, was overwhelming.[26] We overrule his fourth assignment of error.
 VI. Sentencing {¶ 40} In his fifth assignment of error, Dieterle contends that the trial court erred in imposing maximum, consecutive sentences. He argues that the sentences were disproportionate and constituted cruel and unusual punishment. This assignment of error is not well taken.
 {¶ 41} First, Dieterle was convicted of aggravated murder under R.C. 2903.01(B). Since he did not receive the death penalty, the court had no choice but to sentence him to life in prison on that offense.[27] *Page 12 
 {¶ 42} Further, following State v. Foster, [28] trial courts have full discretion to impose prison sentences within the statutory range for the crimes committed. In this case, all of the sentences were within the statutory ranges, and Dieterle has not demonstrated that they were so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion.[29]
 {¶ 43} As a general rule, a sentence that falls within the terms of a valid statute cannot amount to cruel and unusual punishment.[30] The sentences were not so disproportionate to the offenses as to shock the community's sense of justice.[31] To the contrary, this case involves one of the most horrific and brutal murders this court has seen. Despite Dieterle's lack of a prior criminal record, the sentences were completely appropriate. Therefore, we overrule his fifth assignment of error.
 VII. Ineffective Assistance of Counsel {¶ 44} Some procedural confusion occurred at the briefing stage of this case. Dieterle's counsel filed a brief that exceeded the page limits for cases on the accelerated calendar, and this court struck the brief. Subsequently, counsel filed a motion for 16 extra pages or, in the alternative, to remove the case from the accelerated calendar. We overruled that motion.
 {¶ 45} Dieterle's counsel then filed an amended brief in which she asserted an assignment of error that she had not asserted in her previous brief. She also failed to separately argue some of her assignments of error as required by App. R. 16(A)(7), claiming that she had inadequate space. Nevertheless, we *Page 13 
eventually reconsidered our previous decision. We struck the amended brief and reinstated counsel's original brief that exceeded the page limits.
 {¶ 46} Even though we struck counsel's amended brief, we have sua sponte decided to address the additional assignment of error raised in that brief because we believe that the issue raised needs to be decided for this appellate district. In that assignment of error, Dieterle contends that his previous appellate counsel was ineffective for failing to properly delineate the issues for appeal and for failing to request that this case be removed from the accelerated calendar. Essentially, he argues that the page limits prevented him from adequately presenting his arguments. This assignment of error is not well taken.
 {¶ 47} A criminal defendant is entitled to effective assistance of appellate counsel on a first appeal as of right.[32] But Dieterle cannot properly raise the issue at this stage of the proceedings. The Ohio Supreme Court has held that claims of ineffective assistance of appellate counsel may be raised in an application for reopening under App. R. 26(B) or in a direct appeal to the supreme court.[33]
 {¶ 48} The court has made it clear that an application under App. R. 26(B) is not part of the original appeal.[34] "The provisions of App. R. 26(B) were specifically designed to provide for a specialized type of postconviction process. The rule was designed to offer defendants a separate collateral opportunity to raise ineffective-appellate-counsel claims beyond the opportunities that exist through the traditional motions for reconsideration and discretionary appeals to our court or the Supreme Court of the United States."[35] *Page 14 
 {¶ 49} Thus, we conclude that the proper method for Dieterle to raise the issue is through a App. R. 26(B) motion to reopen the appeal after the journalization of this decision. To sustain a claim of ineffective assistance of counsel, Dieterle must show that but for counsel's errors, the results of the proceedings would have been different.[36] In an appeal, no "result" exists until our decision is journalized, and until that time, Dieterle cannot show that the result would have been different. Additionally, the filing of an application under App. R. 26(B) would allow him to present evidence outside the record to support his claim, which we can not consider on direct appeal.[37] Consequently, we strike Dieterle's fifth assignment of error and do not rule on its merits.
 VIII. Summary {¶ 50} In sum, we find no merit in Dieterle's arguments. We overrule his five assignments of error and affirm his convictions.
Judgment affirmed.
HILDEBRANDT, P.J., concurs.
PAINTER, J., concurs separately.
[1] State v. Underwood (1983), 3 Ohio St.3d 12, 13, 444 N.E.2d 1332;State v. Hirsch (1998), 129 Ohio App.3d 294, 309, 717 N.E.2d 789.
[2] See State v. Denkins, 1st Dist. No. C-030518,2004-Ohio-1696, ¶ 34-37; State v. Young, 2nd Dist. No. 19466, 2003-Ohio-4706, ¶ 12-15.
[3] State v. Bayless (1976), 48 Ohio St.2d 73, 357 N.E.2d 1035, paragraph seven of the syllabus, vacated as to death penalty (1978),438 U.S. 911, 98 S.Ct. 3135; State v. Williams, 1st Dist. Nos. C-060631 and C-060668, 2007-Ohio-5577, ¶ 39; State v.Brundage, 1st Dist. No. C-030632, 2004-Ohio-6436, ¶ 33.
[4] Crim. R. 30(A); State v. Coley, 93 Ohio St.3d 253, 266,2001-Ohio-1340, 754 N.E.2d 1129; State v. Dixon, 1st
Dist. No. C-030227, 2004-Ohio-2575, ¶ 21-22.
[5] State v. Comen (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus; State v. Robinson, 1st
Dist. No. C-060434, 2007-Ohio-2388, ¶ 18.
[6] Robinson, supra, at ¶ 18,
[7] State v. Price (1979), 60 Ohio St.2d 136, 398 N.E.2d 772, paragraph four of the syllabus; Robinson, supra, at ¶ 18.
[8] (June 6, 1990), 1st Dist. No. C-880287, affirmed (1991), 61 Ohio St.3d 284, 574 N.E.2d 510.
[9] 64 Ohio St.3d 131, 1992-Ohio-110, 592 N.E.2d 1376.
[10] Id. at 139.
[11] Id., quoting State v. Smith (1991), 60 Ohio St.3d 284, 290,574 N.E.2d 510.
[12] Id.
[13] (1990), 66 Ohio App.3d 438, 585 N.E.2d 532.
[14] Id. at 441.
[15] Id. at 443.
[16] Id.
[17] Id., quoting Limpham v. State (1988), 257 Ga. 808, 810, 364 S.E.2d 840.
[18] Id.
[19] Accord State v. Whitsell (1990), 69 Ohio App.3d 512,591 N.E.2d 265.
[20] State v. Thomas (1988), 40 Ohio St.3d 213, 215-216,433 N.E.2d 286; State v. Finley, 1st Dist. No. C-061052,2008-Ohio-4904, ¶ 24; Brundage, supra, at ¶ 8.
[21] State v. Deem (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus; Finley, supra, at ¶ 24.
[22] 1974 Committee Comment to H.B. No. 511.
[23] See Brundage, supra, at ¶ 10; State v. Coulter (1992),75 Ohio App.3d 219, 225-226, 598 N.E.2d 1324.
[24] State v. DeMarco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus; State v. Brewster, 1st
Dist. Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 63.
[25] Brewster, supra, at ¶ 63.
[26] See Hirsch, supra, at 310.
[27] R.C. 2929.02(B).
[28] 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
[29] See State v. Clark, 71 Ohio St.3d 466, 470, 1994-Ohio-43,644 N.E.2d 331; State v. Henderson, 1st Dist. Nos. C-060799 and C-060823, 2007-Ohio-5128, ¶ 7.
[30] McDougle v. Maxwell (1964), 1 Ohio St.2d 68, 69, 203 N.E.2d 334;Brewster, supra, at ¶ 82.
[31] See State v. Weitbrecht, 86 Ohio St.3d 368, 370-371,1999-Ohio-113, 715 N.E.2d 167; Brewster, supra, at ¶ 84.
[32] Rojas, supra, at 141.
[33] State v. Davis, 119 Ohio St.3d 422, 2008-Ohio-4608,894 N.E.2d 1221, ¶ 8-13; State v. Murnahan (1992), 63 Ohio St.3d 60,584 N.E.2d 1204, paragraph two of the syllabus.
[34] Morgan v. Eads, 104 Ohio St.3d 142, 2004-Ohio-6110,818 N.E.2d 1157, ¶ 2-9.
[35] Id. at ¶ 8.
[36] Strickland v. Washington (1984), 466 U.S. 668, 687-694,104 S.Ct. 2052; Hirsch, supra, at 314-315.
[37] See State v. Ishmail (1978), 54 Ohio St.2d 402, 405-406,377 N.E.2d 500; State v. Person, 174 Ohio App.3d 287, 2007-Ohio-6869,881 N.E.2d 924, ¶ 37.