[Cite as *State v. Hendrix*, 2016-Ohio-2697.]

# IN THE COURT OF APPEALS

## FIRST APPELLATE DISTRICT OF OHIO

## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-150194 |
| | | C-150200 |
| Plaintiff-Appellee, | : | TRIAL NO. B-1400317 |
| vs. | : | |
| | : | *O P I N I O N.* |
| D'JANGO HENDRIX, | | |
| Defendant-Appellant. | : | |

Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  April 27, 2016

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

**FISCHER, Presiding Judge.**

{¶1}  Defendant-appellant D'Jango Hendrix appeals the 53-year sentence imposed by the trial court for four counts of attempted murder and having a weapon while under a disability.  Because we find no merit in his seven assignments of error, we affirm the judgment of the trial court.

*Background Facts and Procedural History*

{¶2}  Shortly after Christmas, in January 2014, Jay Dillon hosted a nighttime bonfire at his Springfield Township home for his family and neighbors to eat and drink, and to burn Christmas trees.  What had begun as a neighborhood party, however, turned into a shootout in the street.  The Springfield Township police were dispatched to investigate shots fired.

{¶3}  The police found four individuals in the front yard of Dillon's home, including Dillon, Kevin Tye, Christopher White, and Donald Raines.  None appeared to police to be inebriated.  The four told police that another neighbor, Hendrix, had started the gun fight, and that Dillon had shot back at Hendrix seven times in self-defense and in defense of the others.  Hendrix had been at the bonfire, but had left after a short tussle with another neighbor, Kent Worley.  The police eventually found an unconscious Hendrix, who had been shot in the abdomen, on the back patio of a home on an adjacent street.  Emergency personnel took Hendrix to University Hospital, while police separated Dillon, Tye, and White and took them into custody for questioning.

{¶4}  Police later interviewed Hendrix in the hospital.  Hendrix's attorney, whom he introduced to police as his friend, was also present.  Hendrix denied having a gun that night, and also denied having any altercation with Worley, claiming

2

instead that he had left his home to meet his friends and did not know why anyone would have shot at him.

{¶5}  Based on the evidence that the police had obtained at the time, the state indicted Hendrix on four counts of felonious assault, four counts of attempted murder, accompanied by firearm specifications, and two counts of having a weapon while under a disability.

{¶6}  The police obtained a search warrant for Hendrix's DNA to compare to DNA found on a firearm police had found near Hendrix's unconscious body the night of the shooting.  When the officer retrieved the DNA swab from Hendrix, Hendrix began explaining bullet trajectories to the officer, and drew a diagram.  The officer ended the conversation, and advised Hendrix to speak with his attorney.

{¶7}  The matter proceeded to a jury trial.  At trial, the state introduced the testimony of the four victims.  Tye testified that on the night of the shooting, he had been at Dillon's home for the bonfire with Raines, White, Dillon, and Hendrix.  Worley, another neighbor, approached the men at the bonfire, and he placed his hand on Tye's shoulder.  Hendrix then stood up and started shouting something about "disrespect."  Hendrix grabbed Worley by the shirt and pushed him back.  The other men separated the two, and Dillon told Hendrix to leave.  Worley left the gathering, and Hendrix left as well, returning to his home across the street.  Tye then saw Hendrix walk out of his house, and he saw Hendrix standing in the middle of the street with his arm outstretched, firing what appeared to be a weapon.  Tye moved from the bonfire area toward Dillon's driveway, and eventually went across the street to his house and grabbed his gun.  Tye admitted on cross-examination that he did not see who had fired the first shot, and he admitted to drinking at least one beer.

3

{¶8} Angela Tye, Kevin's wife, also testified. She called 911 that night after her husband had come inside their home, screaming that a neighbor had gone crazy and that he was going to get his gun.

{¶9} Worley testified consistent with the story told by Tye. Worley approached the bonefire and put his hand on Tye's shoulder, causing Hendrix to push him. Hendrix mumbled something he could not understand. At that point, Worley went home. A bit later, Worley had come out of his home when he heard gun shots, so he went back inside. On cross-examination, Worley admitted that he had been drinking "spiked" coffee that night, but he insisted that he had not been intoxicated. Worley also admitted that he had told police initially that Hendrix had never touched him during the tussle.

{¶10} Raines testified that he had broken up the tussle between Hendrix and Worley, and that Hendrix had placed his hands on Worley's neck. After Dillon told Hendrix to leave, Hendrix came back out of his home with a gun, pointed it at Raines, who was near the firepit, and fired. Raines took cover behind a tree when a second shot was fired. Raines then saw Dillon fire a shot in Hendrix's direction. On cross-examination, Raines admitted that he had told police in his interview that he did not know who had shot back at Hendrix, meaning that he did not know if it had been White or Dillon.

{¶11} White's testimony largely mirrored the others. White testified that after Hendrix had left, White walked towards Dillon's front door. White saw Hendrix aim at the firepit, where Raines had been, and fire two shots. Then, Hendrix turned towards White and Dillon, who were in the front of Dillon's house, pointed his gun at them, and gunshots rang out.

4

{¶12}  Dillon's testimony reiterated the events between Hendrix and Worley, and that Hendrix had grabbed Worley by his shoulders.  Dillon asked Hendrix to apologize, and Hendrix said, "I'm not apologizing to no white motherfucker."  When Dillon told Hendrix to leave, Dillon heard Hendrix say that he would be back with his "burner," which Dillon understood to mean a gun.  Dillon went inside to get his weapon, walked out of his front door and across the driveway.  Dillon saw Hendrix come out of his house, he heard two shots fired in another direction, and then Hendrix pointed the gun towards him and fired.  Dillon returned fire.  Afterwards, Dillon noticed that he had a hole on the inside of his pant leg, presumably from a bullet.  On cross-examination, Dillon admitted that his statement to police did not mention that Hendrix had called Worley a "white motherfucker," or that Hendrix had used the term "burner."

{¶13}  The state also presented the testimony of the detective who had interviewed Hendrix at the hospital, and who had obtained the DNA swab from Hendrix at the justice center.  The detective testified that he had recovered bullets from the outside and inside of Hendrix's property, and that he had found a bullet at the base of a tree in Dillon's yard where Raines had taken cover.  The detective found seven bullet casings in Dillon's front yard, where Dillon had admitted to firing seven shots at Hendrix.

{¶14}  John Heile, a firearm expert, testified that the bullet recovered near the tree on Dillon's property matched a .38-caliber revolver—the same caliber weapon found near Hendrix the night of the shooting.  The parties stipulated that the .38-caliber revolver had Hendrix's blood on it.  Heile also testified that the bullet casings found in Dillon's yard matched the .45-caliber semi-automatic pistol that

Dillon had admitted firing, and that at least the bullet found outside Hendrix's home matched Dillon's weapon.

{¶15} Hendrix testified in his own defense. According to Hendrix, on the night of the shooting, he joined the others at Dillon's bonfire. The whole time Hendrix was there, Worley kept his hand in his pocket. At some point, Hendrix felt that Worley had snuck up on him, and a cursing argument ensued. The men pushed Hendrix, causing his glasses to fall off. Hendrix then left the bonfire, and returned home. After about ten minutes, Hendrix got ready to leave his house again, intending to get in his truck and drive to meet his friends at a bowling alley. Hendrix started walking down the top of his driveway when he was shot. Hendrix then fired back three or four shots. Hendrix testified that he had initially denied having a gun that night to the police, because the gun belonged to his wife, who had been out of town at the time of the shooting, and he had wanted to protect her. When asked why he had grabbed a gun out of the dresser before leaving his house, Hendrix stated that he had been "jumped" before, that "the attitude was a little bit aggressive * * * when I left there," and that Worley had not taken his hand out of his pocket.

{¶16} The jury found Hendrix guilty of all ten counts in the indictment. The trial court merged the two counts of having a weapon while under a disability for the purposes of sentencing, merged the felonious-assault counts into the attempted-murder counts, and also merged all but two of the firearm specifications. The trial court sentenced Hendrix to 11 years on each of the attempted-murder counts, 3 years on each of the firearm specifications, and 36 months on the weapon-under-disability charge. The trial court imposed consecutive prison terms for a total of 53 years in prison.

{¶17} Hendrix now appeals his convictions.

### Challenges to Evidentiary Rulings

{¶18} In his first assignment of error, Hendrix argues that the trial court abused its discretion by making several improper evidentiary rulings.

{¶19} First, Hendrix argues that the trial court erred in allowing the state to impeach Hendrix's credibility with his prior convictions. Hendrix had stipulated to certain prior convictions for purposes of the weapons-under-disability counts, and the state impeached Hendrix with evidence of convictions unrelated to those charges.

{¶20} When cross-examining Hendrix, the prosecutor questioned Hendrix regarding felony convictions he had sustained within the past ten years. The defense attorney objected, and the parties and the court had an unreported sidebar conference. The prosecutor then questioned Hendrix briefly regarding the following prior convictions: trafficking in cocaine, burglary, weapons under disability, harassment by inmate, illegal possession of a firearm in a liquor-permit establishment, intimidation, and discharge of a firearm near a premises. Although Hendrix objected to the introduction of the evidence, we do not know the basis of the objection from the record. Therefore, we review this argument for plain error. *See State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 39.

{¶21} Hendrix argues that the admission of his prior convictions was unduly prejudicial under Evid.R. 403(A), relying on *State v. Creech*, 2014-Ohio-4004, 18 N.E.3d 523 (7th Dist.). In *Creech*, the court held that the trial court had erred in failing to accept a defendant's stipulation that he was under a disability for the purposes of proving a weapons-under-disability charge, relying on Fed.R.Evid. 403

and *Old Chief v. U.S.*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The *Creech* court noted that the prior crimes were "not admissible for any other reason than to show his status as disabled." *Id.* at ¶ 11. In this case, Hendrix testified, and thus the prosecutor could impeach him as a witness with his prior convictions under Evid.R. 609. *See* Evid.R. 609(A)(2) ("[n]otwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."). Therefore, we find *Creech* distinguishable from the case at bar.

{¶22} When a prosecutor uses prior convictions to impeach a witness's general credibility, Evid.R. 609 allows the prosecutor to question the witness regarding the name of the crime, the place of conviction, and the punishment. *See State v. Amburgey*, 33 Ohio St.3d 115, 117, 515 N.E.2d 925 (1987). The prosecutor in this case did just that, thus, on this record, Hendrix has not shown that the admission of his prior convictions constituted plain error. *See Lewis* at ¶ 39.

{¶23} Next, Hendrix argues that the trial court erred in sustaining the state's objection during his closing argument regarding the trajectory of the bullet that passed through Hendrix's body. During trial, Hendrix introduced testimony from Brian Edmunds, a charge nurse at the Hamilton County Justice Center. Edmunds testified that he had measured the entrance and exit wounds on Hendrix's body, and that the entry wound was 43½ inches from the floor, and that the exit wound was 45¾ inches from the floor. During closing argument, defense counsel argued that

Hendrix had been ambushed by gunshots at the top of his driveway when he had walked out of his house, as Hendrix had testified. To support Hendrix's side of the story, defense counsel argued that the entrance- and exit-wound measurements on Hendrix's body indicated that Hendrix had been shot at an upward angle. The prosecutor objected to the defense attorney's argument, which the trial court sustained.

{¶24} Although counsel is afforded latitude in closing argument, the argument must be based on the evidence presented at trial. *See Brokamp v. Mercy Hosp.*, 132 Ohio App.3d 850, 868, 726 N.E.2d 594 (1st Dist.1999). No testimony had been introduced to establish that the locations of Hendrix's entrance and exit wounds indicated a bullet trajectory consistent with an upward-angle shot. Therefore, the trial court properly sustained the state's objection on this basis.

{¶25} We overrule Hendrix's first assignment of error.

### Batson Challenge

{¶26} In his second assignment of error, Hendrix argues that the trial court erred in overruling his objection to the state's use of a peremptory challenge to remove an African-American juror under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{¶27} *Batson* prohibits the exercise of a peremptory strike against a prospective juror solely on the basis of that juror's race, consistent with the Equal Protection Clause. *State v. Robinson*, 1st Dist. Hamilton No. C-140043, 2015-Ohio-773, ¶ 11. Once a *Batson* challenger has made a prima facie showing of discrimination, the party moving for a peremptory strike must give a race-neutral explanation for the strike. *State v. Williams*, 1st Dist. Hamilton No. C-130277, 2014-

Ohio-1526, ¶ 36-37, citing *State v. Herring*, 94 Ohio St.3d 246, 255-256, 762 N.E.2d 940 (2002). The trial court must then determine whether purposeful discrimination occurred. *Williams*, citing *Herring* at 256. A court will not reverse a trial court's finding under *Batson* unless that finding is " 'clearly erroneous.' " *Williams*, quoting *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

{¶28} Defense counsel objected to the state's use of a peremptory challenge to remove an African-American juror—Prospective Juror No. 1—under *Batson*. Defense counsel argued that the prospective juror had indicated during voir dire that she believed police officers were "here to protect and serve." The state responded that it had used the peremptory challenge because of the prospective juror's "criminal background as well as civil lawsuits that she was involved with and also that * * * she was too eager to serve."

{¶29} According to the transcript of voir dire, Prospective Juror No. 1 stated that her husband had been charged with telephone harassment based upon a complaint from a past girlfriend. Springfield Township police had investigated the complaint, and the charge had occurred while the prospective juror and her husband were married. The prospective juror also stated that she or a family member had been involved in a civil case, although the juror indicated that nothing about that civil matter had caused her any concern or had affected her view of the court system.

{¶30} Although the record is unclear as to what the prosecutor meant when commenting on the prospective juror's willingness to serve, the Springfield Township police department had investigated a criminal complaint against her husband—the same department involved in this case. This connection alone is a legitimate, race-neutral explanation for the peremptory strike. Thus, the trial court's finding that the

state did not purposefully discriminate against the prospective juror is not clearly erroneous. *See Robinson* at ¶ 13; *Williams* at ¶ 36. We overrule Hendrix's second assignment of error.

### *Ineffective Assistance of Counsel*

{¶31} In his third assignment of error, Hendrix argues that he received ineffective assistance of counsel.

{¶32} Ineffective assistance of counsel requires a showing that counsel's performance fell below an objective standard of reasonableness, and that the defendant was prejudiced as a result of counsel's deficient performance. *State v. Combs*, 1st Dist. Hamilton No. C-120756, 2013-Ohio-3159, ¶ 24; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶33} Hendrix argues that the following actions of trial counsel constituted ineffective assistance: failing to object to unrecorded sidebar conferences; failing to use a peremptory challenge on a biased juror; failing to make an opening statement; and failing to present expert medical and ballistics witnesses. We address each in turn.

{¶34} *Unrecorded sidebar conferences.* A review of the transcript indicates that the parties and the trial court conducted unrecorded sidebar conferences, which were subsequently summarized in most instances by the trial court on the record. Crim.R. 22 requires the recording of sidebar conferences in serious-offense cases, and a trial court's summary of sidebar conferences in lieu of a recording is error. *State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517, ¶ 79-84 (1st Dist.). However, this court has held that a defendant must demonstrate prejudice as a result of the unrecorded sidebar conferences by using App.R. 9(C) to show that certain

11

information had been left out of the trial court's summaries. *See id.* *State v. Davis*, 1st Dist. Hamilton No. C-130198, 2014-Ohio-794, ¶ 14.

{¶35} Hendrix argues that the unrecorded sidebar conversations prejudiced him because the record does not reflect various objections he made at trial, for example, regarding his *Batson* challenge or the use of prior convictions as impeachment evidence. To demonstrate prejudice, Hendrix cannot rely on the unrecorded sidebar conferences or the sidebar summaries given by the trial court, and, instead, he must supplement the record with missing or inaccurate information, which Hendrix has not done. *See Davis* at ¶ 14. Thus, Hendrix's argument is without merit.

{¶36} *Failure to use a peremptory challenge.* Hendrix contends that his counsel erred by failing to use a peremptory challenge against Prospective Juror No. 12. During voir dire, Prospective Juror No. 12 stated that she would be persuaded by four people who told the same story versus one person who told a different story. Defense counsel asked the trial court to remove Prospective Juror No. 12 for cause. The trial court then questioned the juror regarding her statement, and she clarified that she would weigh each witness's testimony independently. Prospective Juror No. 12 was then seated as a juror.

{¶37} The Ohio Supreme Court has opined regarding the reluctance of a reviewing court to second-guess counsel's decisions regarding voir dire. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63. Although defense counsel had not yet used any peremptory challenges, defense counsel may have found it unnecessary to use a peremptory challenge against Prospective Juror No. 12 after the trial court's further questioning of her. The prospective juror's clarifying

statement showed that she would independently weigh each person's testimony, and that she would not reach a result merely on quantity of evidence. Thus, defense counsel could have made the strategic decision at that point to keep the prospective juror, who would be open to believing his client's story versus the story of the four victims. Hendrix has not shown his counsel was ineffective for failing to use a peremptory challenge.

{¶38} *Failure to give an opening statement.* The record shows that defense counsel asked to defer an opening statement until after the state proceeded with its case-in-chief; however, defense counsel ultimately did not give any opening statement. This court will not second-guess trial-strategy decisions, and we will presume that counsel rendered reasonable professional assistance. *State v. Valines*, 1st Dist. Hamilton No. C-130105, 2014-Ohio-890, ¶ 27. Counsel's choice to forego any opening statement may have been predicated on Hendrix's decision to testify, and the record shows that Hendrix told a different version of events at trial than he did to police. Moreover, Hendrix has not demonstrated that the failure to give an opening statement prejudiced him. *See Strickland*, 466 U.S. at 686, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶39} *Expert testimony on bullet trajectory.* Finally, Hendrix argues that his counsel was ineffective for failing to present an expert witness that could have testified to the trajectory of the bullet that passed through Hendrix's body. Hendrix's speculation that an expert would have testified favorably for him does not demonstrate ineffective assistance of counsel. *See State v. Combs*, 100 Ohio App.3d 90, 104, 652 N.E.2d 205 (1st Dist.1994). This argument is without merit.

{¶40} Because Hendrix failed to demonstrate ineffective assistance of counsel, we overrule Hendrix's third assignment of error.

### Weight and Sufficiency of the Evidence

{¶41} We address Hendrix's fourth and fifth assignments of error together, in which he argues that insufficient evidence was adduced at trial to support the jury's findings of felonious assault and attempted murder with respect to White and Tye, and that his convictions for attempted murder and felonious assault were against the manifest weight of the evidence.

{¶42} As an initial matter, Hendrix was never sentenced on the felonious-assault charges, because they were merged with the attempted-murder charges, so Hendrix cannot appeal the jury's findings with respect to the felonious-assault charges. *See* Crim.R. 32(C); *Columbus v. Ziegler*, 10th Dist. Franklin Nos. 91AP-1058, 91AP-1070 and 91AP-1071, 1992 Ohio App. LEXIS 1023 (Mar. 3, 1992) (in a criminal case, no final, appealable order exists from an offense that has been merged for the purposes of sentencing).

{¶43} As to the sufficiency of the evidence adduced to support his convictions for attempted murder against White and Tye, Hendrix argues that he did not shoot at or near Tye or White, and, at most, the evidence showed that Hendrix shot three times in Raines's direction near the firepit and once at Dillon.

{¶44} In an attempted-murder prosecution, a defendant's specific intent to kill another can be inferred from the defendant's action in discharging a gun in that person's direction. *State v. Wilson*, 8th Dist. Cuyahoga No. 96098, 2011-Ohio-5653, ¶ 6, citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982). An examination of the evidence in the light most favorable to the prosecution shows that

14

Tye and White had been outside in the front of Dillon's home when Hendrix fired at least three gunshots towards Dillon's property. Tye testified that he had been out in front of Dillon's home and then moved to the side of Dillon's truck in the driveway once shots were fired. White testified that he had seen Hendrix aim at the firepit in Raines's direction, and fire two shots, and then Hendrix had turned toward White and Dillon, who had been in front of Dillon's house, and had pointed the gun at them. Given the proximity of White and Tye to the shots fired by Hendrix, sufficient evidence of attempted murder exists. *See State v. Bell*, 8th Dist. Cuyahoga No. 87769, 2006-Ohio-6592, ¶ 65 (sufficient evidence of attempted murder existed where the victims had been in the defendant's "line of fire," although they had not actually been hit by any bullets); *State v. Jenks*, 61 Ohio St.3d 259, 612 N.E.2d 492 (1991).

{¶45} As to the weight of the evidence with respect to Hendrix's attempted-murder charges, Hendrix argues that the evidence showed that he had acted in self-defense. A defendant bears the burden of proving self-defense by a preponderance of the evidence and must show "(1) that he was not at fault in creating the violent situation, (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the force used, and (3) that he did not violate a duty to retreat or to avoid the danger." *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 5.

{¶46} Credibility is an issue for the trier of fact. *State v. Williams*, 1st Dist. Hamilton No. C-140199, 2015-Ohio-3968, ¶ 42. In this case, the jury was free to find the testimony of the four victims more credible than Hendrix's. Hendrix lied to police when they interviewed him in the hospital, by telling police that he did not

have a gun that night and did not know why anyone would shoot at him. Hendrix then reversed course and claimed self-defense at trial. Hendrix claimed that he lied to police to protect his wife, because she owned the gun. The jury could have certainly found it incredible that Hendrix would lie to police, who were investigating serious charges stemming from a gun battle on a residential street, to protect his wife, who was out of town at the time. By contrast, the four victims maintained from the beginning that Hendrix had opened fire on them first. We cannot say Hendrix's convictions were against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶47} We overrule Hendrix's fourth and fifth assignments of error.

### *Cumulative-Error Doctrine*

{¶48} In his sixth assignment of error, Hendrix contends that he was denied a fair trial because of the cumulative effect of the errors at trial, which he identified in his first five assignments of error.

{¶49} The cumulative-error doctrine permits reversal of a conviction where a defendant has been denied a fair trial by the cumulative effect of errors, individually deemed harmless. *State v. Cook*, 1st Dist. Hamilton No. C-140118, 2014-Ohio-4900, ¶ 15, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. In order to succeed under the cumulative-error doctrine, a defendant must establish that the outcome of the trial would have been different absent the errors by the trial court. *See State v. Dieterle*, 1st Dist. Hamilton No. C-070796, 2009-Ohio-1888, ¶ 39. Given the evidence provided by the victims that Hendrix had opened fire on them in a residential neighborhood after an argument, and the lack of credibility in Hendrix's self-defense testimony, this court cannot say

16

that, but for any of the alleged errors pointed out in Hendrix's brief, the outcome of his trial would have been different. We overrule Hendrix's sixth assignment of error.

### *Excessive Sentence*

{¶50} In his seventh assignment of error, Hendrix argues that his maximum, consecutive sentences were contrary to law. Specifically, Hendrix argues that the record does not support the seriousness and recidivism factors in R.C. 2929.12.

{¶51} Applying R.C. 2953.08(G)(2), this court will only modify or vacate a sentence if it clearly and convincingly finds that either the record does not support the mandatory sentencing findings or the sentence is otherwise contrary to law. *State v. Martin*, 1st Dist. Hamilton No. C-150054, 2016-Ohio-802, ¶ 35, citing *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.); *see also State v. Marcum*, Slip Opinion No. 2016-Ohio-1002. Although a court must consider the overriding principles of felony sentencing, including R.C. 2929.12, the court need not make specific findings on the record, and we can presume that a court considered the factors, absent an affirmative demonstration in the record showing otherwise. *State v. Hamberg*, 1st Dist. Hamilton No. C-140536, 2015-Ohio-5074, ¶ 17, citing *State v. Alexander*, 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 24.

{¶52} As to the seriousness factors, Hendrix argues that none of the factors in R.C. 2929.12(B) apply to indicate that Hendrix's crime was more serious than conduct normally constituting the offense, and that all four factors under R.C. 2929.12(C) apply to indicate that his offense was less serious than conduct normally constituting the offense. As to the recidivism factors in R.C. 2929.12(D) and (E), Hendrix argues that the circumstances of this case are not likely to reoccur because

17

they "were so odd." Hendrix acknowledges his criminal past, but argues that he had responded favorably to criminal sanctions by leading a law-abiding life since 2009.

{¶53} We note that the factors listed in R.C. 2929.12(B), (C), (D), and (E) are not exhaustive, and the explicit language of the statutes allows a court to consider any other relevant factors. At the sentencing hearing, the trial court indicated that it had considered Hendrix's criminal history, as outlined in the presentence-investigation report, and the nature and circumstances of the crimes. Therefore, the record indicates that the trial court considered the seriousness and recidivism factors, and Hendrix has not shown that the trial court erred. *See State v. Finnell*, 1st Dist. Hamilton Nos. C-140547 and C-140548, 2015-Ohio-4842, ¶ 55.

{¶54} We overrule Hendrix's seventh assignment of error.

### Conclusion

{¶55} Because Hendrix failed to demonstrate the assigned errors, we affirm the judgment of the trial court.

Judgment affirmed.

**MOCK** and **STAUTBERG, JJ.,** concur.

Please note:
  The court has recorded its own entry on the date of the release of this opinion.